[No. C003972. Third Dist. Sept. 11, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
FIDEL TORRES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III, IV, V, VI, VII, and VIII.

## COUNSEL

Michael A. Satris, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, J. Robert Jibson and Karen L. Ziskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SCOTLAND, J.**—Defendant was convicted of being an accessory after the fact (Pen. Code, § 32) to the homicide of Jesus Rodriguez. Committed to state prison for the middle term of two years, defendant appeals, alleging a variety of errors.

In the published portion of this opinion, we apply the reasoning of *Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285] and *People* v. *McDaniel* (1976) 16 Cal.3d 156 [127 Cal.Rptr. 467, 545 P.2d 843] (cert. den. *McDaniel* v. *California* (1976) 429 U.S. 847 [50 L.Ed.2d 119, 97 S.Ct. 131]), and hold that where a defendant's statement obtained in violation of *Miranda*[1] is otherwise voluntary, a later utterance willingly volunteered in the absence of police interrogation is admissible against the defendant.

We also hold that when a declarant makes an out-of-court statement through an interpreter, and that statement is otherwise admissible, the hearsay rule does not bar a percipient witness other than the interpreter from testifying to the content of the out-of-court statement, even though the witness testifies to the words uttered by the interpreter, not the declarant.

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Our holding is based on the theory of agency, whereby the interpreter's statements are regarded as the statements of the declarant who willingly used the services of the interpreter.

## FACTS

On July 18, 1987, Mario Lopez shot and killed Jesus Rodriguez, because Lopez thought Rodriguez was having an affair with Lopez's wife. Defendant had driven Lopez to the murder scene in Stockton. After the shooting, defendant drove Lopez to Fresno and dropped him off near a bus station. As a result, defendant was charged with being an accessory after the fact to the murder. At trial, the facts unfolded as follows: Defendant and Lopez had known each other approximately six years and were "compadres," a Spanish term that, according to testimony, literally refers to the relationship between a father and his child's godfather, but is used more generally to describe a close friendship.

On the morning of July 18, 1987, Lopez and several other persons were at defendant's house in Stockton. After talking with Lopez, defendant borrowed a car from one of the guests, Angela Misquez. As he was leaving, defendant showed Misquez a gun he said belonged to Lopez. Defendant placed the gun in the waistband of his pants and went outside to meet Lopez. Defendant and Lopez were observed to have a conversation. Lopez seemed to be upset, and defendant appeared to be trying to calm Lopez. The two men then got into Misquez's car, and defendant drove them to Lopez's residence.

Lopez was intoxicated, and defendant helped him up the stairs into the house. Lopez's wife, Theresa, was home, and Lopez began arguing with her, accusing Theresa of having an affair with Rodriguez. At one point, Lopez broke a table and put his hand up as if to strike Theresa. Defendant restrained Lopez and prevented him from hitting her. Despite Theresa's denials, Lopez continued arguing with his wife for 15 to 20 minutes until defendant told Lopez, "Well, if you don't believe her, let's go over there." Before leaving, Lopez asked for his gun, and defendant gave it to him. The two left in Misquez's car, and defendant drove them to Rodriguez's residence.

Defendant and Lopez arrived at Rodriguez's house at approximately 2:30 p.m. Lopez got out of the car holding the gun in his hand and ran up to the porch, with defendant running slightly behind him. Without knocking, Lopez entered Rodriguez's house. Defendant remained outside on the porch. Rodriguez was in the living room. Lopez shot him twice from close range. The wounds to the neck and chest were fatal. After the first shot, a neighbor observed defendant raise his hands in some form of gesture and

state something in Spanish. A few seconds later, Lopez fired the second shot then ran from the house. Defendant followed. They stopped running once they reached the yard, where they began walking side-by-side to the car. Lopez still had the gun in his hand, but held it pointed toward the ground. He did not point the gun at defendant.

Defendant and Lopez got back into the car and left, with defendant driving. Defendant drove Lopez to Fresno, stopping in Livingston to buy gas and in Manteca where he telephoned Lopez's wife. Defendant informed her Lopez had "messed up" and killed Rodriguez and told her to take the children to her mother's house. It is unclear whether defendant then stated he was "going to take [Lopez] out or something like that" or whether he was going to bring Lopez home. However, defendant did not return Lopez to his home in Stockton.

A neighbor copied the license plate number as defendant and Lopez drove away from Rodriguez's house. This information was conveyed to the Stockton Police Department, and defendant was arrested later that evening at his residence.

### DEFENSE

While in custody, defendant volunteered statements in which he claimed Lopez had forced him to drive at gunpoint to Rodriguez's house and from there to Fresno where he dropped off Lopez.

Defendant did not testify at trial. He called several character witnesses who stated that defendant is a peaceful, nonviolent person of upstanding character. In addition, testimony was elicited that defendant appeared frightened when he left the scene of the killing.

### DISCUSSION

### I

Defendant was transported to the Stockton Police Department after his arrest. As he was approached by Sergeant David Knickerbocker, the investigating officer assigned to the case, defendant spontaneously stated in "broken" English that he wanted to tell the truth and volunteered that he had been with Lopez, that Lopez had shot someone, and that Lopez then forced defendant at gunpoint to drive to Fresno. Sergeant Knickerbocker had neither questioned defendant nor said anything to him up to that point. The trial court admitted this evidence, a ruling that defendant does not contest.

After hearing defendant's spontaneous admission, Sergeant Knickerbocker showed defendant a picture of Lopez and, without administering *Miran-*

*da* warnings, began to question defendant regarding Lopez's whereabouts. The trial court excluded defendant's responses, finding that they were obtained in violation of *Miranda*.

After questioning defendant concerning Lopez's whereabouts, Sergeant Knickerbocker wanted to ask about defendant's involvement in the incident. At this point, Knickerbocker ceased questioning defendant and summoned a Spanish-speaking officer, Dale Wagner, to administer *Miranda* warnings in Spanish.

While waiting for Officer Wagner to arrive, defendant remained seated at a desk approximately 15 to 20 feet from Knickerbocker. Sergeant Knickerbocker continued to work on matters pertaining to the investigation of this case but did not say anything to defendant. Approximately 20 to 30 minutes after Knickerbocker had ceased questioning him, defendant volunteered that Lopez forced defendant to drive at gunpoint to and from Rodriguez's house. The trial court denied defendant's motion to exclude this second volunteered statement.

Officer Wagner ultimately arrived and administered *Miranda* warnings in Spanish and English. Defendant initially waived his right to remain silent. Then, after further explanation of his *Miranda* rights, defendant stated he wanted to talk to his attorney, and all questioning ceased.

■ Defendant contends that the court erred in admitting the second volunteered statement. He argues that it is inadmissible as the tainted product of the previous *Miranda* violation, since there was no "break in the causative chain" between the non-*Miranda* statement and the subsequent admission. We disagree.

The "Truth-in-Evidence" provision of the California Constitution, article I, section 28, subdivision (d), requires application of federal law to determine whether a statement obtained in violation of *Miranda* compels exclusion of subsequent statements made by the defendant. (*People* v. *Gastile* (1988) 205 Cal.App.3d 1376, 1385-1386 [253 Cal.Rptr. 283].)

■ In *Oregon* v. *Elstad, supra,* 470 U.S. 298, the United States Supreme Court held that the failure to administer *Miranda* warnings during a custodial interrogation, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise free will, does not mandate the exclusion of a subsequent statement voluntarily made by the defendant after he was advised of and waived his *Miranda* rights. (470 U.S. at p. 309 [84 L.Ed.2d at p. 232].)

In reaching this decision, the Supreme Court held that the lack of a *Miranda* warning is not equivalent to actual police coercion or inducement.

As long as the non-*Miranda* statements were otherwise voluntary, there is no infringement of the defendant's constitutional rights, and subsequent voluntary statements are not subject to exclusion as the tainted product of the *Miranda* violation. (470 U.S. at pp. 308-309, 318 [84 L.Ed.2d at pp. 231-232, 238]; *U.S.* v. *Wauneka* (9th Cir. 1985) 770 F.2d 1434, 1439-1440.) Stated another way, a "fruit of the poisonous tree" analysis does not apply to the "fruit" of a noncoercive *Miranda* violation. (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 308 [84 L.Ed.2d at p. 232]; cf. *Michigan* v. *Tucker* (1974) 417 U.S. 433 [41 L.Ed.2d 182, 94 S.Ct. 2357].) "*Elstad* makes clear that a failure to administer *Miranda* warnings, without more, does not automatically require suppression of the 'fruits' of the uncounseled statement. Where the uncounseled statement is voluntary, and thus not a product of 'inherently coercive police tactics or methods offensive to due process,' there is no fifth amendment violation and the 'fruits' may be admissible in the Government's case-in-chief." (*U.S.* v. *Sangineto-Miranda* (6th Cir. 1988) 859 F.2d 1501, 1517, citations omitted.)

Instead, *Elstad* sets forth a two-step analysis: the trial court must determine (1) whether the statements obtained in violation of *Miranda* were otherwise voluntary; and (2) whether, under the totality of the circumstances, defendant's subsequent statements also were voluntarily made. If both tests are met and the subsequent statements were not themselves directly in response to further non-*Miranda* interrogation, they are admissible against the defendant.

■ Here, unlike the appellant in *Elstad,* defendant was not advised of and did not waive his rights under *Miranda* before blurting out the subsequent statement. However, while the Supreme Court noted that Elstad's *Miranda* waiver was highly probative of the voluntary character of his subsequent statements, the court did not hold that a *Miranda* advisement and waiver are prerequisites for finding such statements to be voluntary. ■ Rather, the trier of fact must examine the totality of the surrounding circumstances and the entire course of police conduct in evaluating the voluntariness of statements which follow a noncoercive *Miranda* violation. (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 318 [84 L.Ed.2d at p. 238].) Of course, as noted above, if the statements are made in response to further police interrogation without a *Miranda* advisement, they would be inadmissible under *Miranda* itself. ■ However, "[s]tatements volunteered when not in response to an interrogation are admissible against a defendant, even after an initial assertion of the right to remain silent." (*People* v. *McDaniel, supra,* 16 Cal.3d at p. 172.) ■ It logically follows that, under *Elstad,* statements willingly volunteered in the absence of interrogation also are admissible against a defendant when made after a noncoercive *Miranda* violation.

Applying *Elstad* and *McDaniel,* we find the evidence supports the trial court's holding that the statement in question was admissible as an uncoerced, voluntary admission.

First, the record reflects that defendant's responses to Sergeant Knickerbocker's questions, while obtained in violation of *Miranda,* were otherwise voluntarily made. Although defendant was in custody at police headquarters, there is no evidence that his statements were other than the product of his free will and rational intellect. Defendant initiated the conversation with Sergeant Knickerbocker by spontaneously stating he wanted to tell the truth and volunteering a brief statement that Lopez was responsible for the shooting and had forced defendant to drive him to Fresno. Defendant had been in custody less than two hours at that point, and Knickerbocker's interrogation following defendant's spontaneous admission was not directed toward defendant's involvement in the crime. It merely consisted of no more than four questions regarding Lopez's whereabouts. Defendant did not attempt to stop the questioning, nor did he complain of improper inducements or indicate that he was being forced to continue with the interview. Rather, the questioning was terminated by Sergeant Knickerbocker so defendant could be advised of his rights under *Miranda* before he was subjected to interrogation regarding his own involvement in the case. We find no evidence of coercion.

The record also supports the trial court's finding that defendant's subsequent, unsolicited statement was willingly volunteered. Sergeant Knickerbocker had ceased questioning defendant, and between 20 to 30 minutes passed before defendant spontaneously volunteered the additional statement. During this interval, Sergeant Knickerbocker had not questioned defendant or made any comment to him. Defendant's subsequent statement did not relate to the subject of the earlier police interrogation, i.e., Lopez's whereabouts, but instead addressed defendant's claim that he was forced to accompany Lopez—the same subject of defendant's initial volunteered statements. Finally, rather than applying coercive methods to encourage defendant to confess, Sergeant Knickerbocker earlier had terminated the interview telling defendant, "We want to take a statement from you about what lead [*sic*] up to this incident . . . but before we take it, I want you to understand your rights. I'm going to call a Spanish speaking officer down and we're going to go through it with you so you totally understand." Despite being so advised, defendant proceeded to volunteer the additional statement before Officer Wagner could arrive to administer the *Miranda* warnings in Spanish.

Under the totality of the circumstances, the trial court properly allowed in evidence the statement defendant willingly volunteered after the termination of his non-*Miranda* interrogation. (*Oregon* v. *Elstad, supra,* 470 U.S. at

pp. 306-309, 318 [84 L.Ed.2d at pp. 230-232, 238]; *People* v. *McDaniel, supra,* 16 Cal.3d at p. 172.)

## II

Three days after his arrest, defendant telephoned the police from the San Joaquin County jail to give them a statement regarding the Rodriguez homicide. Sergeant Melvin Greer, who neither speaks nor understands Spanish, was assigned to interview defendant. Since defendant does not speak English fluently, Officer Wagner, who had translated for defendant on the night of his arrest, acted as an interpreter during this interview. Defendant was given and waived his *Miranda* rights.

At trial, Officer Wagner testified regarding his qualifications as an interpreter and stated that he accurately translated Sergeant Greer's questions and defendant's responses. Sergeant Greer was then called to testify to the content of the statements defendant made during this interview. Defendant objected to Greer's testimony as hearsay. The court overruled the objection but ordered that Officer Wagner be subject to recall in the event defendant had additional questions after Sergeant Greer had completed his testimony. Defendant did not exercise this opportunity to recall Officer Wagner as a witness.

On appeal, defendant contends that Sergeant Greer's testimony was inadmissible hearsay because Greer testified not to defendant's statements but merely to the translations made by Officer Wagner.

Defendant cites several early Supreme Court decisions to support his argument. (*People* v. *John* (1902) 137 Cal. 220 [69 P. 1063]; *People* v. *Ah Yute* (1880) 56 Cal. 119; *People* v. *Lee Fat* (1880) 54 Cal. 527.) In each of these cases, the prosecution sought to admit into evidence testimony the defendant had given through an interpreter during a previous court proceeding. In *Lee Fat,* the prosecutor read notes the official court reporter made of defendant's preliminary hearing testimony. In *Ah Yute* and *John,* the prosecution called the stenographers who reported the defendants' testimony at prior court proceedings. The reporters read their transcriptions of the defendants' testimony. In each case, the Supreme Court held that the testimony constituted inadmissible hearsay, because the reporter transcribed "[the statements] from the lips of the interpreter, and not from the defendant." (*People* v. *Ah Yute, supra,* 56 Cal. at p. 121.) The court reasoned that a witness is incompetent to testify to a statement which must be translated before it can be understood by the witness. Rather than permitting a witness to testify to what the interpreter says the declarant stated, the Supreme Court held that the interpreter or some other witness who understood the statements of the declarant should have testified. (*Ibid.*; *People* v.

*Lee Fat, supra,* 54 Cal. at pp. 531-532; see also *People* v. *Jaramillo* (1934) 137 Cal.App. 232, 235 [30 P.2d 427]; *People* v. *Ong Git* (1913) 23 Cal.App. 148, 155 [137 P. 283]; *People* v. *Petruzo* (1910) 13 Cal.App. 569, 574 [110 P. 324].)

We find that the holdings of *Lee Fat, Ah Yute* and *John* inapplicable here, because they are distinguishable on their facts. In those cases, the interpreters were officers of the court and were not specifically selected by parties who desired to communicate with each other but needed an interpreter to do so. (*Boicelli* v. *Giannini* (1924) 65 Cal.App. 601, 607-608 [224 P. 777].)

When two persons speaking different languages select an interpreter as a medium of their communication, the interpreter is regarded as their joint agent for that purpose. Therefore, the statements of the interpreter "are regarded as the statements of the persons themselves; and like any other admission may be shown by the testimony of any person who heard them without calling the interpreter as a witness." (*Kelly* v. *Ning Yung Ben. Assn.* (1905) 2 Cal.App. 460, 467 [84 P. 321]; *Boicelli* v. *Giannini, supra,* at pp. 607-608; *United States* v. *Beltran* (1st Cir. 1985) 761 F.2d 1, 9; *United States* v. *Alvarez* (11th Cir. 1985) 755 F.2d 830, 859-860 (cert. den. 474 U.S. 905 [88 L.Ed.2d 235, 106 S.Ct. 274]); *United States* v. *Da Silva* (2d Cir. 1983) 725 F.2d 828, 831-832; 3 Wigmore, Evidence (Chadbourn rev. 1976) § 812, subd. (4), p. 283, 4 *op. cit. supra,* § 1079, subd. (6), p. 180, 6 *op. cit. supra,* § 1810, p. 376; 4 Weinstein & Berger, Evidence (9th ed. 1988) § 801(d)(2)(c)[01], pp. 801-217, 801-218, fn. 34; but see, *People* v. *Jaramillo, supra,* at p. 235.) Stated another way, "A party may make an interpreter his agent to communicate; when this has been the case, the interpreter's statements are virtually the extra-judicial admissions of the *party's agent,* and thus are receivable, from anyone who heard them, without calling the interpreter." (3 Wigmore, Evidence (Chadbourn rev. 1976) § 812, subd. (4), p. 283.)[2]

The agency theory applies to statements made through an interpreter unless circumstances are present which would negate the presumption of agency. Factors tending to refute such an inference include a substantial possibility that the interpreter had a motive to misrepresent, such as an interest in shifting suspicion to the accused and away from the interpreter, or a lack of capacity or demonstrated incompetence on the part of the translator. (*United States* v. *Da Silva, supra,* 725 F.2d at pp. 831-832.)

---

[2] Some jurisdictions have not adopted this agency analysis and hold that any extrajudicial statement made through an interpreter is inadmissible as hearsay when the witness understood the statement, not as originally spoken, but as translated by the interpreter. (For a summary of opinions on this subject, see Admissibility of Testimony, Concerning Extrajudicial Statements Made to, or in the Presence of, Witness Through an Interpreter, Annot. (1981) 12 A.L.R.4th 1016.) We decline to follow these holdings, because the agency principle expressed in the body of our opinion is the more convincing legal analysis.

"Where, however, there is no motive to mislead and no reason to believe the translation is inaccurate, the agency relationship may properly be found to exist. In those circumstances the translator is no more than a 'language conduit,' [citation] and a testimonial identity [exists] between declarant and translator. . . ." (*Ibid.*)

■ The fact that the interpreter is a law enforcement officer or other employee of government does not prevent the interpreter from acting as the declarant's agent, even as here where the declarant is being investigated by law enforcement. (*United States* v. *Da Silva, supra,* 725 F.2d at pp. 831-832.) Moreover, the fact that the interpreter was selected by only one of the parties, in this case Sergeant Greer, does not negate an agency relationship. If the declarant knowingly and willingly uses the services of an interpreter selected by another, the interpreter is " 'deemed to act for both parties, and the statements made by the [declarant] consequently [become] original evidence the same as if the [declarant] had himself first selected the interpreter.' " (*State* v. *Letterman* (1980) 47 Ore.App. 1145 [616 P.2d 505, 508, 12 A.L.R.4th 1009] (affd. 291 Ore. 3 [627 P.2d 484]), citing *People* v. *Randazzio* (1909) 194 N.Y. 147 [87 N.E. 112, 116].) In sum, one must look to the totality of the circumstances, e.g., whether the declarant understood the interpreter's role, and whether the declarant freely spoke through the interpreter.

■ In this case, defendant initiated contact with the police and Sergeant Greer for the purpose of giving a statement. Defendant desired to give a statement, and Greer wanted to receive it. Due to defendant's lack of fluency in English, they could communicate only by using the services of an interpreter. Defendant was informed that another officer would serve as the translator and did not object to Officer Wagner acting in that capacity. In fact, defendant willingly made use of him. Defendant does not question Wagner's qualifications as an interpreter, and the accuracy of the translation is not in issue. Office Wagner testified under oath concerning his qualifications and the fact that he accurately translated Greer's questions and defendant's statements.

Under the circumstances, we find that an agency relationship existed. Since Officer Wagner was the mutual agent of defendant and Sergeant Greer for the purpose of facilitating their communication, the holdings of *Lee Fat, Ah Yute* and *John* "have no analogy" to this case and Greer's testimony was not barred by the hearsay rule. Defendant's out-of-court statement was an admission (Evid. Code, § 1220), and the words of the interpreter communicating the statement constituted the authorized statement of defendant. (Evid. Code, § 1222; *Boicelli* v. *Giannini, supra,* 65

Cal.App. at pp. 607-608; *Kelly* v. *Ning Yung Ben. Assn., supra,* 2 Cal.App. at p. 467.)[3]

Although we need not apply *Lee Fat, Ah Yute* and *John,* we feel compelled to question the holdings of these ancient cases, for we believe they no longer can withstand legal scrutiny. The opinions are brusque and contain little analysis. In particular, they are devoid of any analysis of the agency theory applied in this case and contain no discussion of the appropriateness of applying the authorized admission exception to the hearsay rule (Evid. Code, § 1222; see fn. 3, *ante*) or judicially creating an exception to the hearsay rule (cf. *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1125, fn. 31 [200 Cal.Rptr. 789]). For example, some jurisdictions have adopted an exception which permits a witness other than the interpreter to testify to the content of a translated statement when (1) the declarant's statement had an aura of trustworthiness, such as where the declarant had a strong interest in the accuracy of the translation and the interpreter's qualifications are unassailable, and (2) necessity exists for introduction of the out-of-court statement. (See e.g., *State* v. *Letterman, supra,* 616 P.2d at pp. 508-510.)

Moreover, the holdings are unrealistic and unworkable. California's population continues to grow in number and diversity, with many languages spoken in our state. Trial courts must employ numerous court interpreters, whose services in many languages and dialects are essential to the proper administration of our judicial system. On any given day, a court interpreter may be summoned to translate in a number of courtrooms and cases, particularly in law and motion matters and preliminary hearings. The role of the interpreter simply is to accurately convey the substance of the communication between interested parties and the court. The interpreter is not asked and should not be expected to memorialize and remember the content of every communication. That is the role of the official court reporter. It would be impractical and virtually impossible to impose such a duty on court interpreters. In fact, to expect and require interpreters to be able to recall every communication they interpret would place upon them an immense burden which could adversely affect their ability to quickly, accurately, and intelligibly communicate the statements they translate. In addition, it simply is infeasible to expect that a court interpreter could recall the content of the many conversations which an interpreter must communicate day-in and day-out. We recognize that when a court interpreter is unable to remember the statement of a witness for whom the interpreter has translated, and the

---

[3] Evidence Code section 1222 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

transcript does not refresh the interpreter's recollection, the court reporter's recordation of the statement may be admissible under Evidence Code section 1237 as past recollection recorded. However, if the interpreter no longer is available to establish the foundational requirements of Evidence Code section 1237, the statements would be inadmissible under *Lee Fat, Ah Yute,* and *John.*[4]

Simply stated, we believe that continued adherence to the rule of *Lee Fat, Ah Yute* and *John* is legally unsupportable and poses a serious threat to the fair and effective administration of our system of justice. The rule falls particularly hard on defendants in criminal trials, for it is defendants who often seek to impeach witnesses for the prosecution by introducing, via preliminary hearing transcripts, inconsistencies with their testimony at trial. Accordingly, in the interest of justice, we urge the California Supreme Court to reassess these holdings.

### III-VIII*

. . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Carr, Acting P. J., and Sparks, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 1989.

---

[4] Interestingly, in *People* v. *Lewandowski* (1904) 143 Cal. 574 [77 P. 467], which followed *Lee Fat* et al., the California Supreme Court observed that if a court reporter's transcript of an interpreter's statement is inadmissible hearsay, "it would be impossible to take a deposition of a witness unable to speak the English language that would be effectual for any purpose, and that every objection based on the fact that [former] testimony was given . . . through the medium of an interpreter would be equally applicable to all testimony given on a trial through an interpreter." (*Id.,* at p. 578.) In *Lewandowski,* the Supreme Court noted its holdings in *Lee Fat, Ah Yute* and *John* but distinguished the cases, thus finding it unnecessary to discuss them.

* See footnote, *ante*, page 1248.