STATE OF NORTH CAROLINA
v.
DARWIN VILLATORO UMANZOR and JOSE EDIS CARRANZA
No. COA08-1476
Court of Appeals of North Carolina
Filed August 18, 2009
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Barbara A. Shaw and Assistant Attorney General Kimberley A. D'Arruda, for the State.
Duncan B. McCormick, for defendant-appellant Umanzor.
D. Tucker Charns, for defendant-appellant Carranza.
STEELMAN, Judge.
Where the State presented substantial evidence to support every element of the charges brought against Darwin Umanzor and Jose Carranza, the trial court properly denied their motions to dismiss. However, because there was but a single agreement proven at trial, one of their convictions for conspiracy to traffic in 400 or more grams of cocaine must be vacated. Where the trial court instructed the jury that their verdicts must be unanimous, the trial court did not violate Darwin Umanzor's constitutional rights. Where defense counsel failed to object to the challenged testimony regarding Jose Carranza's statement to law enforcement officers and raise the constitutional error at trial, he failed to properly preserve this issue for appellate review.

I. Factual and Procedural Background
At trial, the State's evidence tended to show that on 15 August 2006, a uniformed officer introduced a confidential informant to Charlotte-Mecklenburg Police Detective Kelly Little (Detective Little) and informed him that he had a connection with a person who could deliver "a kilo of cocaine." Based upon this information, Detective Little contacted Diogenes Umanzor (Diogenes), the brother of defendant Darwin Umanzor (Darwin), and arranged for a drug purchase to occur the next day at approximately 1:00 p.m. On 16 August 2006, Diogenes met a person identified as "Palmero" and acquired the cocaine. Diogenes subsequently drove to the apartment complex where defendant Jose Carranza (Carranza) had been residing with a friend and delivered the cocaine to him inside a bundle of clothes. Carranza came outside, "picked it up[,] and took off running back in[to]" the apartment.
Later that morning, Detective Jesus Rendon (Detective Rendon), the primary undercover officer, contacted Diogenes to ask for the price of the cocaine and the location where they were to meet. Detective Rendon and Diogenes decided the location would be the Carvelle Restaurant. Diogenes drove to the hotel and picked up Darwin. Detective Rendon and the confidential informant met Diogenes and Darwin at the restaurant shortly thereafter.
The group entered the restaurant and sat down in a booth. Detective Rendon and Diogenes discussed how and where the transaction would occur. During this conversation, Diogenes informed Detective Rendon that he needed to see $19,500.00 before he would produce the cocaine. Detective Rendon contacted Detective Olmeda, the secondary undercover officer, who drove to the restaurant to show them the "flash money."[1] The group walked outside and when Detective Olmeda arrived, Darwin walked away from where the others were standing toward Detective Olmeda's vehicle. Darwin peered into the passenger's side window where the money was located, looked back at Detective Rendon and Diogenes, and "gave [them] a nod" to indicate "it was good to go." Detective Olmeda then drove off. Detective Rendon stated that they would need to meet in public. Diogenes responded that he did not trust Detective Rendon and explained that during a prior drug deal he had $120,000.00 worth of cocaine stolen from him. They agreed that Detective Rendon would go retrieve the money, Diogenes would retrieve the cocaine, and that just the two of them would meet later to complete the deal. During this conversation, Detective Rendon, Darwin, and Diogenes were standing "about a couple of inches from each other[.]"
As Diogenes and Darwin left the restaurant in Darwin's Nissan Pathfinder, surveillance officers followed them to the apartment complex where Carranza was located. Diogenes called Carranza and told him to "bring [him] some clothing[.]" Surveillance officers observed Carranza standing outside of the apartment complex with a "square shaped object that was blue in color underneath his arm." When the Pathfinder pulled into the parking lot, Carranza got into the back passenger side seat with the package. Surveillance officers then followed the vehicle to a Mini Mart located next to a laundromat.
Detective Rendon was tasked with convincing Diogenes to follow him to a gas station so that on the way the vehicle could be stopped and searched. However, Diogenes was adamant that Detective Rendon meet him at the "coin laundry." Detective Rendon agreed, but once again attempted to get Diogenes to follow him. After arguing over the location of the transaction, Detective Rendon told Diogenes that he was not interested and did not like the situation. Detective Rendon drove off, gave the take down signal, and officers converged on the Pathfinder. Diogenes was apprehended inside the vehicle. Darwin and Carranza were arrested inside the Mini Mart. A search of the vehicle revealed 973.13 grams of cocaine.
Both Darwin and Carranza (defendants) were indicted on charges of conspiracy to traffic 400 or more grams of cocaine by transportation and delivery, and trafficking in 400 or more grams of cocaine by possession. Defendants' charges were joined for trial. At trial, Diogenes testified on defendants' behalf.[2] A summation of Diogenes' trial testimony tended to show that neither Carranza nor Darwin knew about the drug transaction and that both were "innocent."
On 8 February 2008, a jury found defendants guilty of each charge. The trial court determined both defendants to be a prior record level I for felony sentencing purposes. The trial court consolidated the charges against each defendant into one judgment and imposed identical active prison terms of 175 to 219 months. Defendants appeal.

II. Motions to Dismiss

A. Standard of Review
"Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980) (citations omitted). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Smith, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted).
The test of the sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both. "When the motion . . . calls into question the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." In passing on the motion, evidence favorable to the State is to be considered as a whole in order to determine its sufficiency. This is especially true when the evidence is circumstantial since one bit of such evidence will rarely point to a defendant's guilt.
Powell, 299 N.C. at 99, 261 S.E.2d at 117-18 (internal citation and quotation omitted). We must view the evidence "in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn [therefrom]. Contradictions and discrepancies must be resolved in favor of the State, and the defendant's evidence, unless favorable to the State, is not to be taken into consideration." State v. Bullard, 312 N.C. 129, 160, 322 S.E.2d 370, 387-88 (1984) (internal citations omitted).
Because defendants presented evidence at trial, they waived their right to appeal the denial of their motions to dismiss at the close of the State's evidence and therefore, only the motions to dismiss at the close of all the evidence are before this Court. State v. Mash, 328 N.C. 61, 66, 399 S.E.2d 307, 311 (1991).

B. Darwin's Motions to Dismiss

1. Trafficking in Cocaine by Possession
In his first argument, Darwin contends the trial court erred by denying his motion to dismiss the charge of trafficking in 400 or more grams of cocaine by possession where there was no evidence presented that tended to show he possessed the cocaine. We disagree.
At the outset, we note that an acting in concert instruction was not requested by the State nor given to the jury by the trial court. Therefore, we must determine whether Darwin and Carranza, actually or constructively possessed the cocaine.
It is well-established that possession of a controlled substance may be actual or constructive. State v. Baldwin, 161 N.C. App. 382, 391, 588 S.E.2d 497, 504 (2003). It is undisputed that Darwin never had actual possession of the cocaine seized from the back seat of his vehicle. Therefore, our analysis centers upon whether Darwin constructively possessed the cocaine. Our Supreme Court has repeatedly enunciated the applicable law regarding the doctrine of constructive possession:
Constructive possession exists when the defendant, while not having actual possession,. . . has the intent and capability to maintain control and dominion over the narcotics. Where such materials are found on the premises under the control of an accused, this fact, in and of itself, gives rise to an inference of knowledge and possession which may be sufficient to carry the case to the jury on a charge of unlawful possession. However, unless the person has exclusive possession of the place where the narcotics are found, the State must show other incriminating circumstances before constructive possession may be inferred.
State v. Butler, 356 N.C. 141, 146, 567 S.E.2d 137, 140 (2002) (quoting State v. Matias, 354 N.C. 549, 552, 556 S.E.2d 269, 270-71 (2001) (internal quotations and citation omitted). Where a defendant is the owner of the vehicle in which a controlled substance is found, an inference that he was in constructive possession of that controlled substance is permissible. State v. Dow, 70 N.C. App. 82, 85, 318 S.E.2d 883, 886 (1984); but see State v. Weems, 31 N.C. App. 569, 571, 230 S.E.2d 193, 194 (1976) (holding "the mere presence of the defendant in an automobile in which illicit drugs are found does not, without more, constitute sufficient proof of his possession of such drugs.").
In the instant case, Darwin was the registered owner of the Nissan Pathfinder from which the cocaine was seized. Although Darwin was not inside the vehicle when police officers executed the take down, he was seen exiting the vehicle immediately before that event and was arrested inside the Mini Mart. Earlier that day, Darwin accompanied Diogenes to a restaurant and sat in a booth while Diogenes and Detective Rendon discussed the particulars of the drug transaction. When Detective Olmeda arrived at the restaurant, Darwin was sent to verify that the money to be used to purchase the cocaine was not false and confirmed that it was not. After he was arrested, Darwin admitted to police officers that Diogenes wanted him to come to the restaurant "because he knew about false money" and that after he viewed the money he knew that it was drug related. Nevertheless, Darwin continued to accompany Diogenes to pick up the cocaine from Carranza and meet Detective Rendon to attempt to complete the drug transaction.
In the light most favorable to the State, this evidence was sufficient to submit to the jury the issue of whether Darwin constructively possessed the 973.13 grams of cocaine seized from his vehicle at the Mini Mart. The trial court properly denied Darwin's motion to dismiss the charge of trafficking in 400 or more grams of cocaine by possession.

2. Conspiracy to Traffic Cocaine
In his second argument, Darwin contends the trial court erred by denying his motion to dismiss the charges of conspiracy to traffic in 400 or more grams of cocaine by delivery and transportation where no evidence was presented that tended to show he entered into an agreement to do such.
A criminal conspiracy is an agreement between two or more people to do an unlawful act or to do a lawful act in an unlawful manner. In order to prove conspiracy, the State need not prove an express agreement; evidence tending to show a mutual, implied understanding will suffice. Nor is it necessary that the unlawful act be completed.
State v. Morgan, 329 N.C. 654, 658, 406 S.E.2d 833, 835 (1991) (internal citations omitted). We hold that the above-described evidence was sufficient to establish that Darwin had "a mutual, implied understanding" with Diogenes and conspired to traffic in 400 or more grams of cocaine.
However, defendant argues and the State concedes, that one conviction for conspiracy must be vacated because only a single agreement was proven at trial. We agree. See State v. Howell, 169 N.C. App. 741, 749, 611 S.E.2d 200, 205 ("[I]t is the number of separate agreements, rather than the number of substantive offenses agreed upon, which determines the number of conspiracies." (quotation omitted)), disc. review denied, 360 N.C. 71, 622 S.E.2d 500 (2005). In the instant case, because the agreement to deliver the cocaine to Detective Rendon necessarily encompassed its transport, we must arrest judgment as to Darwin's conviction of conspiracy to traffic in 400 or more grams of cocaine by transportation. See id. at 274, 611 S.E.2d at 206. However, Darwin's active prison sentence is not affected. Trafficking in 400 or more grams of cocaine and conspiracy to traffic in cocaine are Class D felonies, which carry a mandatory sentence of a minimum of 175 to a maximum of 219 months imprisonment. N.C. Gen. Stat. §§ 90-95(h)(3)(c), -95(i). Because the trial court consolidated all three convictions into one judgment and imposed the mandatory sentence for a Class D felony, there is no need for Darwin to be resentenced. Id.

C. Carranza's Motions to Dismiss

1. Trafficking in Cocaine by Possession
In his first argument, Carranza contends the trial court erred by denying his motion to dismiss the charge of trafficking in 400 grams or more of cocaine because the State failed to present substantial evidence that tended to show Carranza knew the bundle of clothes contained the controlled substance.[3] We disagree.
In the instant case, it is undisputed that Carranza had actual possession of the cocaine on 16 August 2006. The dispositive issue is whether his possession was "knowing."[4]See Baldwin, 161 N.C. App. at 391, 588 S.E.2d at 504 (stating that trafficking in cocaine by possession requires the State to prove that the controlled substance was knowingly possessed); State v. Alston, ___ N.C. App. ___, ___, 668 S.E.2d 383, 386 (2008) ("A person has actual possession of a controlled substance if it is on his person, he is aware of its presence, and, either by himself or together with others, he has the power and intent to control its disposition or use." (citation omitted) (emphasis added)), aff'd per curiam, ___ N.C. ___, 677 S.E.2d 455 (2009).
In the light most favorable to the State, the evidence in this case tended to show that Carranza had come to Charlotte from Honduras via Atlanta with Diogenes. Diogenes had known Carranza for three years and knew Carranza "would do [him] a favor[.]" On the morning of 16 August 2006, Diogenes gave a "bundle of clothes" containing the cocaine to Carranza for safe-keeping because Palmero had threatened to kill him if he lost the cocaine. Diogenes explained the transaction as follows:
I went to the parking lot where Jose Carranza lives and I called him. I said, `I'm bringing some clothing.' He picked it up right where he was living and he took it and kept it at his apartment. . . . I told him that there was shampoo inside, but I don't know if he heard me say that. He didn't ask me what was inside and I did not tell him what was inside.

(Emphasis added). Diogenes alleged that the group was supposed to go swimming later that day, but subsequently stated that he had no intentions of doing so.
Several hours later, surveillance officers observed Carranza waiting by the apartment complex steps for Diogenes to pick him up. Officers noticed a square, blue object underneath his arm. When the Pathfinder pulled into the parking lot, Carranza got into the back passenger side seat. When the vehicle stopped and parked at the Mini Mart, Carranza immediately exited the vehicle. As officers executed the take down, Carranza ran toward the store and was arrested inside the Mini Mart. Officers later found the cocaine in the back seat where Carranza had been sitting. The cocaine had been wrapped in cellophane and was placed in a white plastic bag before being placed inside various items of clothes. The cocaine was "completely sealed in the clothes."
Several descriptions of this "bundle" were given at trial. The cocaine was compressed in the cellophane wrap in a "brick form." The "brick" was hard and measured "nine inches by five and a half, by one and a half." The clothes were then "very tightly wrapped up" in two pairs of denim jeans and a shirt to form a square shape. One of the surveillance officers testified that the package did not look like a bundle of clothing.
Although the State's case against Carranza was based largely on circumstantial evidence to establish that he knew the package contained cocaine, it is sufficient to support a reasonable inference of Carranza's guilt. See McNeil, 359 N.C. at 813, 617 S.E.2d at 279 ("[I]t is important analytically to appreciate that actual possession may be proven by circumstantial evidence . . .."). This Court has repeatedly stated that "`[i]n `borderline' or close cases, our courts have consistently expressed a preference for submitting issues to the jury . . . .'" State v. Jenkins, 167 N.C. App. 696, 701, 606 S.E.2d 430, 433 (quoting State v. Jackson, 103 N.C. App. 239, 244, 405 S.E.2d 354, 357 (1991)), aff'd per curiam, 359 N.C. 423, 611 S.E.2d 833 (2005). In the instant case, Diogenes and Carranza had a long-standing friendship. Diogenes knew Carranza would do him a favor and dropped off a square-shaped bundle covered by two pairs of jeans and a shirt for safe-keeping. Carranza allegedly believed that they were going swimming later that day. However, it is difficult to understand why two pairs of denim jeans would be needed at a swimming pool. Further, Diogenes was not residing at that apartment nor did he allege that the pool they would be visiting was within that complex. When Diogenes called, Carranza immediately came outside of the apartment to receive the package and according to Diogenes required no explanation as to what was contained in the package or why he wanted him to hold it. Approximately five hours later, Diogenes returned to retrieve the cocaine. Carranza brought the package to Diogenes and got into the vehicle. Diogenes testified that upon entering the vehicle, Carranza curiously inquired into where he was going and Diogenes replied, "I'm going to buy some sodas."
Considering the evidence as a whole, we hold the State presented substantial evidence tending to show Carranza "knowingly possessed" the cocaine. Powell, 299 N.C. at 99, 261 S.E.2d at 117. The trial court did not err by denying Carranza's motion to dismiss the charge of trafficking in 400 or more grams of cocaine by possession.

2. Conspiracy to Traffic Cocaine
Based upon the facts presented in the preceding section, we also hold the State presented sufficient evidence to establish that Carranza had "a mutual, implied understanding" with Diogenes and conspired to traffic in 400 or more grams of cocaine. Morgan, 329 N.C. at 658, 406 S.E.2d at 835. However, based on the analysis presented in section II.B.2 of this opinion, we must vacate Carranza's conviction of conspiracy to traffic in 400 or more grams of cocaine by transportation.

III. Jury Instructions
In his third argument, Darwin argues that the trial court's disjunctive jury instructions violated his constitutional right to a unanimous jury verdict with respect to his conspiracy conviction. We disagree.
Darwin specifically argues the trial court erred by instructing the jury that in order to find him guilty of conspiracy to commit trafficking in cocaine, they could find he entered into an agreement with "Jose Edis Carranza or Diogenes Villatoro Umanzor[.]" This Court has expressly rejected this argument in State v. Worthington, 84 N.C. App. 150, 352 S.E.2d 695, disc. review denied, 319 N.C. 677, 356 S.E.2d 785 (1987). In Worthington, the jury verdict sheet stated: "As to the charge of conspiring with Dalton Woodrow Worthington, Sr. and/or Patricia Ann Newby . . . ." 84 N.C. App. at 159, 352 S.E.2d at 701 (emphasis added). The defendant argued that the verdict was defective because there was the possibility that some jurors found a conspiracy with Worthington and others found a conspiracy with Newby. Id. This Court stated:
[T]he trial court carefully instructed the jurors that each of their verdicts must be unanimous, and the unanimity requirement was repeated upon the court's later inquiry of the jurors as to their progress in deliberations. We hold that the instructions were adequate to insure that defendant's right to a unanimous verdict was not violated.
Id. In the instant case, the trial court clearly stated to the jurors: "You may not return a verdict until all twelve jurors agree. In North Carolina you may not return a verdict by majority vote, it must be unanimous." Further, when the jury returned its verdict, the trial court asked the foreperson whether the jury had reached a unanimous verdict. The foreperson answered in the affirmative. Based upon the reasoning in Worthington, Darwin's contention is without merit.

IV. Testimonial Evidence
In his third argument, Carranza argues the trial court erred by overruling his hearsay objection to Detective Little's testimony as to what an interpreter told him regarding Carranza's statement to police. Carranza argues Detective Little's hearsay statement violated his right to confrontation under Crawford v. Washington. We disagree.
It is well-established that "constitutional error will not be considered for the first time on appeal." State v. Chapman, 359 N.C. 328, 366, 611 S.E.2d 794, 822 (2005) (citation omitted). At trial, defense counsel failed to object to the challenged testimony. Because defense counsel failed to object based on constitutional grounds at trial, he has failed to properly preserve it for appellate review.
We note that on the merits, Carranza's argument also fails. In State v. Felton, our Supreme Court first addressed the issue of "whether a law enforcement officer who interrogates a suspect with the aid of an interpreter may testify at trial regarding the suspect's responses . . . even though the interpreter herself does not testify." 330 N.C. 619, 633, 412 S.E.2d 344, 353 (1992). The Court surveyed the law of other jurisdictions and found that the modern trend was "in favor of admitting evidence of this type, primarily on the theory that the interpreter is an agent of the accused." Id. at 634, 412 S.E.2d at 353-54 (citations omitted). The Court then adopted the following rules as to the scope of the agency theory:
The agency theory applies to statements made through an interpreter unless circumstances are present which would negate the presumption of agency. Factors tending to refute such an inference include a substantial possibility that the interpreter had a motive to misrepresent, such as an interest in shifting suspicion to the accused and away from the interpreter, or a lack of capacity or demonstrated incompetence on the part of the translator. "Where, however, there is no motive to mislead and no reason to believe the translation is inaccurate, the agency relationship may properly be found to exist. In those circumstances the translator is no more than a `language conduit,' . . . and a testimonial identity exists between declarant and translator. . . ."
Id. at 635, 412 S.E.2d at 354 (quoting People v. Torres, 213 Cal. App. 3d 1257, 1258-59, 262 Cal. Rptr. 323, 327-28 (1989)) (alteration omitted). The Court further stated that "[t]he mere fact that an interpreter is selected by law enforcement officers, or is employed by a law enforcement agency, is insufficient to remove the presumption of agency that arises when an accused accepts the benefit of the proffered translation to make a voluntary statement." Id. at 636, 412 S.E.2d at 355. In the instant case, Carranza makes no argument that Detective Robert Rendon[5], as Carranza's interpreter, had a "motive to mislead" or that there was "reason to believe the translation is inaccurate[.]" Id. at 635, 412 S.E.2d at 354. Therefore, Detective Little's testimony regarding Carranza's responses during interrogation, as translated to him by Detective Robert Rendon, fell within the exception to the hearsay rule for admissions of a party opponent. Id. at 637, 412 S.E.2d at 355. "[W]here hearsay proffered by the prosecution comes within a firmly rooted exception to the hearsay rule, the Confrontation Clause of the North Carolina Constitution is not violated . . . ." State v. Jackson, 348 N.C. 644, 654, 503 S.E.2d 101, 107 (1998). This argument is without merit.
NO ERROR IN PART AND VACATED IN PART.
Judges HUNTER, Robert C. and GEER concur.
Report per Rule 30(e).
NOTES
[1] Detective Little testified that the "flash money" was "packaged to make it look like $19,500.00, but it was not that much money."
[2] Diogenes pled guilty to trafficking in cocaine and received a reduced sentence of a minimum of seventy and a maximum of eighty-four months imprisonment based upon his willingness to provide law enforcement and the District Attorney's Office with substantial assistance in other drug trafficking cases.
[3] In his brief and during oral arguments, defense counsel largely relied upon Diogenes' trial testimony to establish Carranza did not knowingly possess the cocaine. However, a defendant's evidence "is not to be taken into consideration" on a motion to dismiss unless it is favorable to the State. Bullard, 312 N.C. at 160, 322 S.E.2d at 388.
[4] In support of its contention that it met its burden of proving Carranza "knowingly possessed" the cocaine, the State cites several cases that deal with the issue of whether a defendant had constructive possession over controlled substances found inside a vehicle. Because Carranza had actual possession of the cocaine on 16 August 2006, these cases and their analyses are inapposite. See State v. McNeil, 359 N.C. 800, 813, 617 S.E.2d 271, 279 (2005) ("[A]ctual and constructive possession often so shade into one another that it is difficult to say where one ends and the other begins. This ambiguity is likely attributable to the fact that both actual and constructive possession will support a finding of `possession' within the meaning of our statutes, making it unnecessary to distinguish between the two in many instances." (internal quotation omitted)). The State also cites the unpublished case of State v. Villarreal, ___ N.C. App. ___, 671 S.E.2d 595 (2008) (unpublished). However, the facts of Villarreal are markedly different from those in the instant case and, therefore, it is not applicable here.
[5] We note that Detective Robert Rendon is a different police officer than the previously mentioned investigating officer Detective Jesus Rendon.