STATE OF NORTH CAROLINA v. CLAUDE ALGUSTIS FELTON, JR.

No. 247A91

(Filed 27 January 1992)

**1. Constitutional Law § 224 (NCI4th) — murder — prior mistrial — no double jeopardy**

The trial court did not err by denying a murder defendant's motion to dismiss for former jeopardy where defendant's first trial ended in a mistrial after the jury could not reach a verdict. Although defendant contended that there was no manifest necessity for the order of mistrial in the first trial, the court's decision to declare a mistrial is discretionary and there was no abuse of discretion here. Even if the trial court's prefatory description of the motivating factors leading to its order of mistrial did not amount to a finding of fact as mandated by N.C.G.S. § 15A-1064, any such error is clearly harmless as the record here reveals ample factual support for the mistrial order.

Am Jur 2d, Criminal Law §§ 303, 307.

**2. Criminal Law § 572 (NCI4th) — murder — mistrial — request to modify verdict form denied**

The trial court did not erroneously declare a mistrial in defendant's previous trial for murder, so that his current motion to dismiss for former jeopardy was properly denied, where the jury in the first trial returned to the courtroom without a verdict, defendant requested submission of modified verdict forms which would have permitted the jury to express its agreement as to a verdict on either of the murder charges including a possible jury agreement to reject a verdict of first-degree murder, and the court rejected those requests. There is no indication that the jury had in fact reached agreement as to any issue or that the jurors were confused by the verdict forms before them, and it cannot be said that the court abused its discretion.

Am Jur 2d, Criminal Law § 303.

**3. Evidence and Witnesses § 2052 (NCI4th) — murder — identity — opinion of witness**

The trial court did not err in a murder prosecution by admitting testimony on redirect from a witness who was the

daughter of one victim and the sister of the other that she felt that defendant was responsible for the deaths of the victims because he was the only person who could have had a key to the apartment. Defendant's questions dealing with the exculpatory portions of the witness's statements to investigating officers opened the door for the State to inquire about other portions of the statements inculpating defendant; it is permissible on redirect examination to ask questions designed to clarify the witness's testimony on cross-examination, even if the resulting testimony would have been inadmissible otherwise.

**Am Jur 2d, Evidence § 1143; Homicide §§ 272, 278.**

4. **Evidence and Witnesses § 1113 (NCI4th) — murder — deaf-mute defendant — statements to officer through interpreter — officer's testimony admissible**

The trial court did not err in a murder prosecution by admitting an SBI agent's testimony regarding defendant's responses during interrogation where defendant was a deaf mute, he was interrogated with the aid of an interpreter, and the interpreter was not required to take the stand. Defendant makes no argument that the interpreter was not qualified or competent, there is no hint of a motive on her part to shift suspicion to the accused or to misrepresent defendant's responses during translation, defendant has never indicated that the SBI agent's account of defendant's responses was incorrect in any respect, and nothing in the record indicates dissatisfaction with the interpreter's performance or impartiality. The mere fact that an interpreter is selected by law enforcement officers, or is employed by a law enforcement agency, is insufficient to remove the presumption of agency that arises when an accused accepts the benefit of the proffered translation to make a voluntary statement. The SBI agent's testimony regarding defendant's responses during the interrogation, as translated to him by the duly qualified interpreter, was proper because it fell within the exception to the hearsay rule for admissions of a party opponent made through defendant's agent, the interpreter. N.C.G.S. § 8B-2(d).

**Am Jur 2d, Evidence § 501; Trial § 233.**

STATE v. FELTON

[330 N.C. 619 (1992)]

Admissibility of testimony concerning extrajudicial statements made to, or in presence of, witness through an interpreter. 12 ALR4th 1016.

5. **Evidence and Witnesses § 1482 (NCI4th) — murder — bullets recovered near defendant's home — admissible**

The trial court did not err in a murder prosecution by allowing the State to present evidence regarding four bullets recovered from a discarded water heater near defendant's home. The significant similarities between the bullets found near defendant's house and the bullet that killed the victim circumstantially connect defendant to the murders, and it could not be concluded that there was unfair prejudice to defendant substantially outweighing the probative value of the evidence.

Am Jur 2d, Evidence §§ 771, 774, 775; Homicide §§ 409, 414.

6. **Evidence and Witnesses § 2555 (NCI4th) — deaf-mute defendant — statements to witness — competence to understand**

The trial court did not err by allowing a witness in a murder prosecution to testify about statements the deaf-mute defendant made to her. The trial court conducted a voir dire to discover the nature of the statements and the witness's ability to understand defendant and there was sufficient evidence of her ability to communicate with defendant to establish her as a competent witness capable of understanding and recounting his communications to her.

Am Jur 2d, Evidence §§ 501, 592, 593.

Criminal trial of deaf, mute, or blind person. 80 ALR2d 1084.

7. **Evidence and Witnesses §§ 1113, 650 (NCI4th) — murder — statements to witness — admissions of party opponent — failure to make findings**

There was no error in a murder prosecution in the admission of statements made by defendant to the witness where the statements were admissions excluded from the hearsay rule by N.C.G.S. § 8C-1, Rule 801(d). Defendant's objection is not properly characterized as a motion to suppress within the meaning of N.C.G.S. § 15A-977, so that the failure of the

STATE v. FELTON

[330 N.C. 619 (1992)]

trial court to make findings of fact under that statute is of no moment.

**Am Jur 2d, Evidence §§ 526, 542, 543, 582, 583.**

**8. Evidence and Witnesses § 1006 (NCI4th) — murder — statements of victim — hearsay — residual exception**

The trial court in a murder prosecution did not err by admitting hearsay statements attributed to one of the victims where the court, for each of the seven witnesses, described the statements at issue and announced on the record its findings and conclusions as to the adequacy of notice, the unavailability of the declarant, the inadmissibility of the statements under other Rule 804 exceptions, the circumstances guaranteeing the reliability or truthfulness of the declarant's statement, the material issues as to which the statements were especially probative, and the fact that in its opinion the statements' admission was in the interests of justice. The trial court's findings supporting the trustworthiness of the statements are sufficient to withstand constitutional challenge as well.

**Am Jur 2d, Evidence § 496.**

**Uniform Evidence Rule 803(24): the residual hearsay exception. 51 ALR4th 999.**

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing two consecutive sentences of life imprisonment entered by *Grant, J.*, at the 20 August 1990 Criminal Session of Superior Court, CHOWAN County, upon a jury verdict finding defendant guilty of one count of first-degree murder and one count of second-degree murder. Heard in the Supreme Court 12 November 1991.

*Lacy H. Thornburg, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*W. T. Culpepper, III, and Samuel Bobbitt Dixon for defendant appellant.*

WHICHARD, Justice.

On 3 October 1988, defendant was indicted on two counts of first-degree murder for the deaths of Sarah Jones and her daughter, Falinda Brooks. Defendant's first capital trial for the murders, with

## STATE v. FELTON

[330 N.C. 619 (1992)]

Judge Brown presiding at the 22 January 1990 Criminal Session of Superior Court, Chowan County, ended in a mistrial. Defendant's second capital trial commenced before a jury at the 20 August 1990 Criminal Session of Superior Court, Chowan County, with Judge Grant presiding. On 31 August 1990, the jury returned verdicts of guilty of first-degree murder for the death of Sarah Jones and second-degree murder for the death of Falinda Brooks. After a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant receive a life sentence for the first-degree murder charge. The trial court then sentenced defendant to two consecutive terms of life imprisonment. Defendant appealed his first-degree murder conviction as of right and on 2 July 1991, we allowed his motion to bypass the Court of Appeals as to the second-degree murder conviction. We conclude that defendant received a fair trial, free from prejudicial error.

The State presented evidence tending to show the following: Toya Jones was the twelve-year-old sister of Falinda Brooks and the daughter of Sarah Jones. Toya lived with her mother and sister in an apartment at One Davis Place, in Edenton, North Carolina. Toya spent the weekend of 27 August 1988 with her grandmother, but she returned home the morning of Sunday, 28 August. Upon returning home, Toya discovered that the front and back doors were locked. When no one responded to her knocking on the doors, Toya went to a neighbor's house. The neighbor, Evette Williams, returned with Toya to her mother's house, but again they received no answer to repeated knocks on the door. Toya testified that she then looked through one of the front windows and saw her mother lying on the couch and her sister Falinda lying on the floor in the front room. Sarah Jones was wearing a nightgown and Falinda Brooks was wearing a t-shirt and panties; both Sarah and Falinda were bloody. Toya and Evette asked that someone call the police and then they went back to Evette's house.

Toya also testified that she had seen defendant at her mother's apartment previously. She testified that he once had a key to the apartment, but that he had returned it. Toya also said that defendant carried in his pocket a silver gun and a black knife.

Dr. Leibert Devine, the medical examiner for Chowan County, testified that he examined the bodies of Sarah Jones and Falinda Brooks at the murder scene. His examination revealed that the victims had been dead for several hours. There was a large amount

of blood beneath Sarah Jones' body on the couch. Dr. Devine found several stab wounds in the front of Jones' chest and one defensive stab wound on her left arm. Dr. Devine testified that the cause of death was a knife wound to the lung or heart cavity. Dr. Devine testified that Falinda Brooks' face was bruised and swollen. There was a large amount of blood beneath her head and a laceration to the scalp. Brooks' eyes were swollen up to four times the normal size, which indicated that she had received a major trauma to the head such as a contact gunshot wound. Dr. Devine testified that in his opinion Jones and Brooks were killed between midnight and 6:00 a.m. on the morning of 28 August 1988.

Dr. Page Hudson, a regional forensic pathologist, testified that Sarah Jones suffered injuries to her head and knife wounds to the chest, back, and arms. Dr. Hudson testified that Jones' skull was caved in and that her brain was bruised. The injury to her skull was consistent with a blunt force wound inflicted by a glass bottle. Dr. Hudson also testified that he found a gunshot wound above Falinda Brooks' hairline. He determined that the bullet causing this wound went through Brooks' head and brain and was the cause of death. Dr. Hudson recovered the .25 caliber bullet from Brooks' brain.

Chief Williams of the Edenton Police Department testified that he discovered a broken soft drink bottle near Sarah Jones' foot and an unbroken bottle on the floor near Falinda Brooks. State Bureau of Investigation Special Agent Ransome testified that when Jones' body was taken from the apartment, he discovered a .25 caliber shell casing in the crease of the couch where Jones lay.

Agent Ransome also testified that he saw defendant on Sunday evening, 28 August, and asked him for the clothes he had been wearing the previous night. Ransome identified in court a pair of blue jeans, a gray and black Harley-Davidson t-shirt, and a black t-shirt. Ransome testified that when he saw defendant on 28 August, defendant had a fresh scar on his right temple which appeared to have been bleeding. Ransome also testified that a bone-handled pocketknife in a brown case and a white shirt with dark stains were taken from defendant's residence; the white shirt was found underneath the mobile home. Additionally, investigators removed four bullets from an old water heater in the yard behind defendant's residence.

Agent Dennis Honeycutt testified that he examined defendant's car and discovered blood on the steering wheel, the driver's side arm rest, and the inside door handle. SBI Agent David Spittle, an expert in forensic serology, reported the presence of blood on the pocket and front of the leg areas of defendant's jeans. SBI Agent John Bendure, testifying as an expert in the field of fiber identification and comparison, said that red fibers found on defendant's clothing and car could have originated from the same source as red fibers found in the carpet in the victims' apartment. Bendure also testified that yellow fibers found on Jones' body and the couch on which she was found could have come from the same source as yellow fibers found on defendant's jeans. In addition, cotton and polyester fibers found on the victims could have originated from defendant's t-shirts.

SBI Special Agent Ricky Navarro testified as an expert in the field of latent evidence and fingerprint identification. Agent Navarro testified that he found in the victims' kitchen a latent palm print matching defendant's right palm. He also found defendant's left palm print on the interior of the back door to the apartment. Agent Navarro further testified that he found in the living room a bloody latent fingerprint matching defendant's right index finger.

SBI Special Agent Eugene Bishop testified as an expert in the field of forensic firearm identification. Bishop testified that the bullet recovered from Falinda Brooks' head was a .25 caliber bullet manufactured by CCI and that it had rifling characteristics of six lands and grooves with a right-hand twist. Bishop said that the four bullets recovered from the water heater behind defendant's trailer were .25 caliber CCI bullets and they all exhibited the same rifling characteristics as the one that killed Brooks. Bishop was unable to determine if all the bullets had been fired from the same gun.

Connie Jernigan testified for the State that she had known defendant for about eight years and that she had dated him for about a year in 1988. Jernigan testified that she had seen defendant with a silver-colored .25 caliber pistol. She also said that she had seen defendant's knife and that every time he left his house he had both the gun and knife with him. Jernigan testified that she saw defendant at a lounge in Hertford, North Carolina, at about 10:00 p.m. on Saturday evening, the 27th of August. Though defend-

ant is a deaf mute, Jernigan could communicate with him because he had taught her hand signals. Jernigan and defendant went to two clubs together and then separated sometime before midnight. Jernigan testified that she saw defendant later that evening when he came to Jernigan's aunt's house, where she was staying. Still later, about 4:15 a.m., Jernigan was at another bar when she saw defendant. She testified that defendant seemed upset at the time and he had two fresh scratches on his face and blood on his wrist. Defendant demonstrated to Jernigan that he had been in a fight. Jernigan testified that although defendant had both his gun and knife earlier in the evening, when she saw him at 4:15 a.m., he had neither. Two days later, Jernigan saw defendant again and asked him about his gun and knife. According to Jernigan, defendant responded that he was smart and had thrown them away. Defendant threatened Jernigan with violence if she talked to the police.

In addition to the evidence described above, the State called several witnesses to testify about the nature of defendant's relationship with the victims. This testimony is the subject of one of defendant's assignments of error and will be described in more detail below. The bulk of the testimony, however, described defendant's jealous behavior and rough treatment, including physical brutality and threats, of Sarah Jones.

The State also presented evidence of Agent Ransome's interview with defendant, with the assistance of a certified interpreter, on 28 August. Through the interpreter, defendant told Agent Ransome that he was with Connie Jernigan from 9:30 p.m. on Saturday, 27 August until midnight. Defendant said that he drove around between midnight and 6:00 a.m. and then returned home. Defendant said that he received the scratch on his forehead from working on his car.

Defendant did not testify in his own behalf, but he presented evidence tending to show the following: George Everette, owner of a nightclub in Hertford, North Carolina, testified that he had known defendant for about seventeen years. Everette testified that he saw defendant at his club from approximately 9:30 p.m. until midnight on Saturday evening, 27 August. He testified that defendant returned to the club at 12:30 a.m. and stayed there until 1:45 a.m. Everette said that he saw defendant again later that evening, between 2:15 a.m. and 2:30 a.m., at another club.

STATE v. FELTON

[330 N.C. 619 (1992)]

Defendant presented several other witnesses in support of his alibi defense. Gina White testified at defendant's first trial and the jury in this trial heard her previous testimony that she saw defendant at midnight and at 3:30 a.m. on the night of the killings. Erma Harris testified that she saw defendant at 9:30 p.m., at 11:00 p.m., at 3:00 a.m., and at 3:45 a.m. on the night in question. Daisy Cebollero testified that defendant gave her a ride from Hertford to Edenton at approximately 4:25 a.m. on 28 August. Vicki Harrell testified that defendant came to her house and brought breakfast to her between 5:00 and 5:30 a.m. on 28 August.

Defendant's father, Claude Felton, Sr., testified that defendant worked on his car on 27 August 1988. On that day, defendant showed his father a cut on his head that resulted from working on the car.

Additional facts will be discussed as necessary for a proper resolution of the issues raised by defendant.

[1] Defendant first assigns as error the trial court's refusal to grant his motion to dismiss, offered prior to the commencement of defendant's second trial, on the basis of former jeopardy. Defendant argues that (1) there was no manifest necessity for the order of mistrial entered at his first trial, and (2) the trial court erred in refusing to modify the verdict form and give additional jury instructions prior to declaring a mistrial at the first trial. We disagree.

The prohibition against double jeopardy is a fundamental principle of the common law of North Carolina and it is "viewed as an integral part of the 'law of the land' guarantees currently contained in article I, section 19 of the Constitution of North Carolina." *State v. Lachat*, 317 N.C. 73, 82, 343 S.E.2d 872, 877 (1986). The Fifth Amendment of the United States Constitution provides similar protections. *Arizona v. Washington*, 434 U.S. 497, 54 L. Ed. 2d 717 (1978).

Defendant is correct that "[u]nder the common law of this State . . . a trial court in a capital case has no authority to discharge the jury without [his] consent and hold [him] for a second trial, absent a showing of 'manifest necessity' for a mistrial." *State v. Lachat*, 317 N.C. at 82-83, 343 S.E.2d at 877. Other, statutory bases for declaring a mistrial are found in N.C.G.S. §§ 15A-1061 to -1063. "[W]here the order of mistrial has been improperly entered over

STATE v. FELTON

[330 N.C. 619 (1992)]

a defendant's objection, defendant's motion for dismissal at a subsequent trial on the same charges must be granted." *State v. Odom*, 316 N.C. 306, 310, 341 S.E.2d 332, 334 (1986). Further, our cases and statutes require a trial court, when declaring a mistrial, " 'to find the facts and set them out in the record, so that [the] conclusion as to the matter of law arising from the facts may be reviewed by this Court.' " *State v. Lachat*, 317 N.C. at 83, 343 S.E.2d at 877 (quoting *State v. Jefferson*, 66 N.C. 309 (1872) ); *see also* N.C.G.S. § 15A-1064 (1988).

The decision to grant a mistrial, however, lies within the sound discretion of the trial court. *State v. Pakulski*, 319 N.C. 562, 568, 356 S.E.2d 319, 323 (1987); *see also Arizona v. Washington*, 434 U.S. 497, 54 L. Ed. 2d 717. Our cases describe a deadlocked or "hung" jury as a paradigmatic example of manifest necessity requiring the declaration of a mistrial. *State v. Odom*, 316 N.C. at 310, 341 S.E.2d at 334; *see also United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L. Ed. 165 (1824). Similarly, under our statutes a court may declare a mistrial where "[i]t appears there is no reasonable probability of the jury's agreement upon a verdict." N.C.G.S. § 15A-1063(2) (1988); *see also* N.C.G.S. § 15A-1235(d) (1988). Thus, the prohibition against double jeopardy does not prevent the second trial of an accused when his previous trial ended in a hung jury.

The transcript of defendant's first trial reveals the following facts and circumstances leading to the trial court's declaration of mistrial: The jury first retired to deliberate at 1:38 p.m. on 30 January 1990, and it returned without having reached a verdict at 4:47 p.m. The jury reconvened at 9:30 a.m. on 31 January 1990, but the trial court ordered a recess until 6 February 1990 due to the death of a juror's spouse. The jury finally resumed its deliberations at 9:30 a.m. on 6 February. At 11:35 a.m., the jury returned to the courtroom and the following exchange occurred:

THE COURT: Mr. Foreman, the jury knocked on the door to the jury. I'll ask you first and just wait until I finish the question and answer the question either yes or no, has the jury arrived at a verdict in either of the cases?

THE FOREMAN: No, sir.

THE COURT: What purpose did the jury knock on the jury room door?

STATE v. FELTON

[330 N.C. 619 (1992)]

THE FOREMAN: We have I think reached the point that no one wants to change their mind.

The court then reinstructed the jury and asked it to retire and continue its deliberations. At this point defense counsel unsuccessfully requested additional instructions and the submission to the jury of a modified verdict form. The jury deliberated from 11:39 a.m. until 12:30 p.m., at which point the court again addressed the jury as follows:

THE COURT: Mr. Eliot, I take it the jury has not arrived at verdicts?

THE FOREMAN: We have not Your Honor.

THE COURT: Let me ask you, do you feel the jury is making any progress since the last time you went to the jury room?

THE FOREMAN: No, sir. We haven't moved at all.

THE COURT: Do you feel if I allow you to continue deliberating any further that there's any reasonable possibility that you will be able to resolve your differences?

THE FOREMAN: In my opinion, I don't think there would be but I would hate to take that on myself to say for sure.

THE COURT: Are there any members of the jury who feel that if you were allowed to deliberate further that there is some possibility that you could allow your differences?

THE FOREMAN: They were given that opportunity, sir.

THE COURT: All right. You can have a seat. The Court, having been advised by the foreman that the jury has been unable to arrive at verdicts, that in his opinion any further deliberations would not serve a useful purpose and in his opinion the jury would not be able to arrive at verdicts in the cases. If there's any member of the jury that feels that that is not correct, I want you to let me know at this time. All right. The Court, having been so advised, will withdraw juror number five, Mr. Eliot, and declare a mistrial in each of the cases.

At that point, defense counsel renewed his request for additional instructions and objected to the order of mistrial. The trial court then entered a judgment of mistrial in which it essentially repeated the facts described in the last quoted paragraph above.

We disagree with defendant's argument that the above described facts and circumstances do not reveal a manifest necessity for declaring a mistrial on the grounds that the jury was deadlocked. As noted above, the trial court's decision to declare a mistrial is discretionary. There was no abuse of discretion here. The court made its decision to declare a mistrial only after it instructed the jury members, upon first discovering their initial inability to reach agreement, on their duty to make diligent efforts to resolve differences of opinion. When the jury again returned to the courtroom, the trial court inquired of the foreman whether any progress had been made and whether the foreman believed there was a reasonable possibility that continued deliberations would resolve the differences. *Cf. State v. Odom*, 316 N.C. at 311, 341 S.E.2d at 335 (court's improper order of mistrial did not refer to any evidence supporting a conclusion jury not likely to agree at some later point). The court then inquired twice as to whether the other jury members were in agreement that continued deliberations would be fruitless. The foreman indicated that the other members of the jury already had been given a chance to request continued deliberations, and when the trial court addressed the other members of the jury directly on this point, no one expressed a desire to continue deliberating. By then the jury had deliberated for more than six hours over a period of two days.

The trial court's discretion to declare a mistrial is constrained, however, by the requirement that it set out the facts underlying its decision in order to allow proper review upon appeal. In this case, the trial court declared the mistrial only after stating for the record the basis therefor—"having been advised . . . that the jury has been unable to arrive at verdicts, [and] that . . . any further deliberations would not serve a useful purpose and . . . the jury would not be able to arrive at verdicts . . . ." In substantial compliance with N.C.G.S. § 15A-1064, the trial court in this instance set out a sufficient factual basis for its order of mistrial.

Even if the trial court's prefatory description of the motivating factors leading to its order of mistrial did not amount to a "finding of fact" as mandated by N.C.G.S. § 15A-1064, any such error is clearly harmless as the record here reveals ample factual support for the mistrial order. *See State v. White*, 85 N.C. App. 81, 354 S.E.2d 324 (1987), *aff'd*, 322 N.C. 506, 369 S.E.2d 813 (1988); *see also State v. Johnson*, 60 N.C. App. 369, 299 S.E.2d 237, *disc. rev. denied*, 308 N.C. 679, 304 S.E.2d 759 (1983). In *State v. Pakulski*,

319 N.C. 562, 356 S.E.2d 319, the trial court failed to make findings in support of its mistrial declaration. This Court, without expressly denominating as error the violation of N.C.G.S. § 15A-1064, found no double jeopardy violation because "[j]ury deadlock [was] certainly apparent in the record" of that trial. *Id.* at 570, 356 S.E.2d at 324. The Court in *Pakulski* must have reached the result it did via harmless error analysis, as there was no discussion ameliorating the obvious statutory violation. As in *Pakulski*, the record here is replete with evidence that the jury was truly unable to reach a unanimous agreement upon a verdict; defendant therefore is not entitled to relief on this assignment of error.

[2] Defendant also argues that the trial court erroneously declared the mistrial because it rejected defendant's request to modify the verdict forms submitted to the jury and to give additional instructions. At defendant's first trial, the court instructed the jury to return "one of the following verdicts in each of the cases. Guilty of first degree murder, guilty of second degree murder or not guilty." The verdict forms submitted to the jury required the foreman to check one of the three verdicts upon which the jury agreed — guilty of first-degree murder, or guilty of second-degree murder, or not guilty.

Defendant's jury deliberated for over three hours on 30 January 1990, and over two hours on 6 February 1990. After the jury's initial return to the courtroom without a verdict on 6 February, defendant argued to the trial court that perhaps the jury had agreed on a verdict of not guilty to the charges of first-degree murder, but that it was unable to agree whether the verdict should be guilty of second-degree murder or not guilty. Defendant thus requested submission of modified verdict forms as follows:

## FIRST ISSUE

(1) a. _____ Guilty of first degree murder; or

    b. _____ Not guilty of first degree murder.

## SECOND ISSUE

(2) a. _____ Guilty of second degree murder; or

    b. _____ Not guilty of second degree murder.

Defendant argues that his proposed instructions and modified verdict form would have permitted the jury to express its agreement,

STATE v. FELTON

[330 N.C. 619 (1992)]

if any, as to a verdict on either of the murder charges, thereby obviating any "manifest necessity" for declaring a mistrial. Further, if the jury had agreed to reject a verdict of guilty of first-degree murder, then the modified verdict form would allow expression of that fact and protect the defendant from a subsequent trial on that charge. Defendant argues that the trial court abused its discretion in rejecting his requests.

We find no abuse of the trial court's discretion. The instructions and verdict forms given to the jury were accurate and in accordance with the law. There is no indication that the jury had in fact reached agreement as to any issue or that the jurors were confused by the verdict forms before them. In fact, the trial court instructed the jury that it was to consider the charge of second-degree murder only if it unanimously agreed to acquit on first-degree murder. The jury foreman's indications that the jury was unable to reach agreement, therefore, are some evidence that the jury remained deadlocked on the charge of first-degree murder. Defendant's speculation that perhaps the jury already had ruled out the possibility of a first-degree murder verdict is not supported by facts in the record; thus, we cannot say the trial court abused its discretion in refusing to give additional instructions or to modify the verdict forms. In a slightly different context, we declined to adopt the New Mexico rule requiring trial courts to submit verdict forms to determine if a jury has voted unanimously for acquittal on any of the included offenses in a case. *State v. Booker*, 306 N.C. 302, 293 S.E.2d 78 (1982) (defendant unsuccessfully sought implied acquittal on first-degree murder charge where foreman indicated jury was deadlocked seven to five in favor of verdict of guilty of second-degree murder). Defendant is not entitled to relief under this assignment of error.

[3] Defendant next contends the trial court erred in overruling his objection to certain testimony of Toya Jones, the daughter of one victim and sister of the other. Defendant argues that Jones' testimony amounted to impermissible lay opinion on the ultimate issue in the case, defendant's identity as the murderer. Defendant says that Jones' testimony was not helpful to the jury and was not admissible under N.C.G.S. § 8C-1, Rules 701 and 704.

The trial court did not err in allowing this testimony. The context in which the disputed testimony arose is as follows: During the State's direct examination Jones testified that she had seen

defendant at her mother's apartment on several occasions and that defendant once had a key to the apartment, but that he had returned it some time prior to the murders. Defense counsel then cross-examined Jones extensively with statements she had given to officers investigating the crimes. During that cross-examination, defense counsel asked Jones whether she had told the officers "that [she] had no idea as to who would have wanted to hurt [her] mother and sister." Jones answered this question: "Yes." Defense counsel also asked whether Jones had told Special Agent Ransome that defendant once had a key to the apartment, but that he had returned it to Jones' grandmother. On redirect examination, over defendant's objection, the trial court permitted Jones' affirmative reply to the following question by the State: "Do you recall telling Agent Wooten that you felt [defendant] was responsible for the deaths of your mother and your sister because [defendant] was the only person who could have had a key to the apartment?"

Jones' response to the State's question on redirect examination was not impermissible lay opinion testimony embracing an ultimate issue in the case. Instead, defendant's questions dealing with the exculpatory portions of Jones' statements to investigating officers opened the door for the State to inquire about other portions of the statements inculpating defendant. It is permissible on redirect examination to ask questions designed to clarify the witness' testimony on cross-examination, even if the resulting testimony would have been inadmissible otherwise. State v. Gappins, 320 N.C. 64, 67, 357 S.E.2d 654, 657 (1987); State v. Williams, 315 N.C. 310, 320, 338 S.E.2d 75, 82 (1986). This assignment of error is without merit.

[4] Defendant next brings forward an issue of first impression in this state—whether a law enforcement officer who interrogates a suspect with the aid of an interpreter may testify at trial regarding the suspect's responses, unintelligible to the officer without benefit of interpretation, even though the interpreter herself does not testify. We conclude that he may.

On Sunday, 28 August 1988, Special Agent Ransome interviewed defendant, a deaf mute, with the aid of Kathy Beetham, an interpreter procured for defendant pursuant to N.C.G.S. § 8B-2(d). The State called Ransome at trial to testify as to defendant's statements during that interview. Defendant objected to this

STATE v. FELTON

[330 N.C. 619 (1992)]

testimony on the grounds that Ransome was not qualified to interpret defendant's nonverbal communications and that the proper procedure would be to have Ransome testify as to the questions he propounded to the interpreter, then to have the interpreter testify as to the translation of each question to defendant and defendant's response to her. The trial court conducted a voir dire hearing on defendant's objection, but ultimately allowed Agent Ransome to testify without requiring the interpreter to take the stand.

Ransome's testimony regarding defendant's interpreted responses to his questions included several important details, including: a description of the clothes defendant was wearing on the night in question; defendant was with Connie Jernigan on the night in question; defendant drove around from 12:00 a.m. until 6:00 a.m., when he finally went home; defendant tried to get a gun permit previously and he had once bought a .22 Magnum gun which the police had taken from him some time ago; before giving them to Agent Ransome, defendant had washed the clothes he was wearing on the night in question; he received the scratch on his head by working on his car; and several other statements describing defendant's whereabouts on the night in question.

There is a division of authority on this question. Several courts have prohibited an officer's in-court testimony, which relates a third party's translation of an accused's responses to interrogation, because it contains two levels of hearsay. The modern trend, however, is in favor of admitting evidence of this type, primarily on the theory that the interpreter is an agent of the accused. *Compare United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991); *United States v. Lopez*, 937 F.2d 716 (2d Cir. 1991); *United States v. Koskerides*, 877 F.2d 1129 (2d Cir. 1989); *United States v. Alvarez*, 755 F.2d 830 (11th Cir.), *cert. denied*, 474 U.S. 905, 88 L. Ed. 2d 235 (1985); *United States v. Da Silva*, 725 F.2d 828 (2d Cir. 1983); *United States v. Belton*, 761 F.2d 1 (1st Cir. 1985); *People v. Torres*, 213 Cal. App. 3d 1248, 262 Cal. Rptr. 323 (1989); *Chao v. State*, 478 So. 2d 30 (Fla. 1985); *People v. Romero*, 78 N.Y.2d 355, 575 N.Y.S.2d 802, 581 N.E.2d 1048 (1991); *State v. Letterman*, 47 Or. App. 1145, 616 P.2d 505 (1980), *aff'd*, 291 Or. 3, 627 P.2d 484 (1981); and *State v. Robles*, 157 Wis. 2d 55, 458 N.W.2d 818 (Ct. App. 1990), *aff'd*, 162 Wis. 2d 883, 470 N.W.2d 900 (1991), *with Indian Fred v. State*, 36 Ariz. 48, 282 P. 930 (1929); *State v. Fong Loon*, 29 Idaho 248, 158 P. 233 (1916); *Garcia v. State*, 159 Neb. 571,

68 N.W.2d 151 (1955); *State v. Terline*, 23 R.I. 530, 51 A. 204 (1902); *Boyd v. State*, 78 Tex. Crim. 28, 180 S.W. 230 (1915); and *State v. Huynh*, 49 Wash. App. 192, 742 P.2d 160 (1987).

In *Robles*, the Wisconsin Court of Appeals noted:

The majority view holds that a defendant's statements made to an interpreter which, in turn, are relayed to an interrogator are not barred by the hearsay rule when the interrogator testifies. These cases reason that the interpreter, in effect, becomes that defendant's agent; hence the translation is attributable to the defendant as his own admission.

*State v. Robles*, 157 Wis. 2d at 61-62, 458 N.W.2d at 821. Alternatively, at least one court viewed the "attribution of an agency as an artifice . . . [in cases] where the interpreter has been selected by prosecutorial forces investigating the defendant's participation in a crime," yet nonetheless admitted the evidence because the interrogator's hearsay testimony possessed "circumstantial guarantees of trustworthiness." *State v. Terrazas*, 162 Ariz. 357, 360 n.3, 783 P.2d 803, 806 n.3 (1989); *see also* Romualdo P. Eclavea, Annotation, *Admissibility of Testimony Concerning Extrajudicial Statements Made to, or in Presence of, Witness Through an Interpreter*, 12 A.L.R.4th 1016, 1020 (1982); 29 Am. Jur. 2d *Evidence* § 501 (1967).

The scope of the agency theory generally is stated as follows:

The agency theory applies to statements made through an interpreter unless circumstances are present which would negate the presumption of agency. Factors tending to refute such an inference include a substantial possibility that the interpreter had a motive to misrepresent, such as an interest in shifting suspicion to the accused and away from the interpreter, or a lack of capacity or demonstrated incompetence on the part of the translator. "Where, however, there is no motive to mislead and no reason to believe the translation is inaccurate, the agency relationship may properly be found to exist. In those circumstances the translator is no more than a 'language conduit,' . . . and a testimonial identity [exists] between declarant and translator. . . ."

*People v. Torres*, 213 Cal. App. 3d 1257, 1258-59, 262 Cal. Rptr. 323, 327-28 (1989) (quoting *United States v. Da Silva*, 725 F.2d at 831-32) (citations and footnote omitted); *see also* 4 Jack B. Wein-

stein & Margaret A. Berger, *Evidence*, ¶ 801(d)(2)(C)[01], at 801-279 (1991).

Defendant makes no argument that the interpreter, Kathy Beetham, was not qualified or competent. In fact, the record reveals that at trial defense counsel stipulated to Beetham's qualifications. Further, there is no hint of a motive on her part to "shift suspicion to the accused" or to misrepresent defendant's responses during translation. *Cf. People v. Romera*, 575 N.Y.S.2d 802, 78 N.Y.2d 355, 581 N.E.2d 1048 (court notes precedential support for admitting testimony in instances such as this, but concludes on facts of that case there *was* reason to believe the interpreter, an informant whose compensation depended on the success of the prosecution, had a motive to shift suspicion to the accused). Additionally, we discern no prejudice to defendant as his argument, both at trial and on appeal, is merely that the better practice is to have the interpreter testify in addition to the interrogating officer. Though we are inclined to agree that such a procedure is preferable,[1] we note that defendant has never indicated, by way of objection at trial or argument on appeal, that Agent Ransome's account of defendant's responses to interrogation was incorrect in any respect.

Although defendant did not himself select the interpreter for the interview, nothing in the record indicates dissatisfaction with Ms. Beetham's performance or impartiality. The mere fact that an interpreter is selected by law enforcement officers, or is employed by a law enforcement agency, is insufficient to remove the presumption of agency that arises when an accused accepts the benefit of the proffered translation to make a voluntary statement. This rule is a necessary corollary to N.C.G.S. § 8B-2(d), which provides that:

---

1. In *Chao v. State*, 453 So. 2d 878 (Fla. App. 1984), the Florida Court of Appeals stated in a footnote that the translator's testimony at trial that he accurately translated the interrogation at issue was "not a required predicate" to admission of the interrogator's testimony about the interrogation. *Id.* at 880 n.4. The Supreme Court of Florida did not address this footnote in its opinion affirming the defendant's conviction. *Chao v. State*, 478 So. 2d 30. We note, however, that in several of the cases following the "agency" rule the interpreter has testified at trial, at least so far as to confirm the accuracy of the translation. *See, e.g., State v. Letterman*, 47 Or. App. 1145, 616 P.2d 505; *State v. Spivey*, 755 S.W.2d 361 (Mo. App. 1988); *People v. Torres*, 213 Cal. App. 3d 1248, 262 Cal. Rptr. 323. In the case at bar, the interpreter did not testify, but she was present and interpreted for defendant at the trial.

STATE v. FELTON

[330 N.C. 619 (1992)]

> If a deaf person is arrested for an alleged violation of
> criminal law of the State . . . the arresting officer shall im-
> mediately procure a qualified interpreter from the appropriate
> court for any interrogation, warning, notification of rights, ar-
> raignment, bail hearing or other preliminary proceeding
> . . . . No answer, statement or admission taken from the deaf
> person without a qualified interpreter present and functioning
> is admissible in court for any purpose.

N.C.G.S. § 8B-2(d) (1991).

In *Torres*, the Supreme Court of California found an agency
relationship even where the defendant's interpreter was a law en-
forcement colleague of the interrogating officer.

> The fact that the interpreter is a law enforcement officer
> or other employee of government does not prevent the inter-
> preter from acting as the declarant's agent, even as here where
> the declarant is being investigated by law enforcement.
> Moreover, the fact that the interpreter was selected by only
> one of the parties . . . does not negate an agency relationship.
> If the declarant knowingly and willingly uses the services of
> an interpreter selected by another, the interpreter is " 'deemed
> to act for both parties, and the statements made by the
> [declarant] consequently [become] original evidence the same
> as if the [declarant] had himself first selected the interpreter.' "

*People v. Torres*, 213 Cal. App. 3d 1257, 1259, 262 Cal. Rptr. 323,
329 (quoting *State v. Letterman*, 47 Or. App. 1145, 616 P.2d 505,
508) (citations and footnote omitted).

Thus, we conclude that Agent Ransome's testimony regarding
defendant's responses during interrogation, as translated to him
by the duly qualified interpreter, was proper because it fell within
the exception to the hearsay rule for admissions of a party opponent
made through defendant's agent, the interpreter. Defendant is
therefore entitled to no relief on this assignment of error.

[5] Defendant next contends the trial court erred in allowing the
State to present evidence regarding four bullets recovered from
a discarded water heater near defendant's home. SBI Agent Bishop,
testifying as an expert in the area of forensic firearm identification,
described the four bullets and compared them to the .25 caliber
bullet recovered from Falinda Brooks' head. According to Bishop,
all the bullets were .25 caliber bullets, manufactured by CCI, with

rifling characteristics of six lands and grooves with a right-hand twist. Though the bullets could have been fired from the same gun, Bishop could not conclude that they actually were fired from the same gun. Bishop also testified that CCI bullets commonly are sold and that many different kinds of .25 caliber guns could produce the rifling characteristics exhibited by these bullets. Defendant contends that this evidence should have been excluded because it was irrelevant and unfairly prejudicial.

Under our rules of evidence, unless otherwise provided, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1988). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988). In criminal cases, " '[E]very circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury.' " *State v. Whiteside*, 325 N.C. 389, 397, 383 S.E.2d 911, 915 (1989) (quoting *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966)).

The autopsy of Falinda Brooks revealed that the .25 caliber bullet lodged in her brain was the cause of her death. Agent Bishop testified that the bullet recovered from Brooks' head was manufactured by CCI and had rifling characteristics of six lands and grooves with a right-hand twist. The proffered testimony about the presence in a water heater behind defendant's house of four .25 caliber CCI bullets with rifling characteristics matching the lethal bullet is clearly relevant as circumstantial evidence linking defendant to evidence directly related to the crime. The lack of evidence that defendant actually fired the bullets into the water heater, the uncertain length of time the bullets had been in the water heater, the popularity of CCI bullets, and the fact that several types of .25 caliber guns could have produced the rifling characteristics at issue, impact the weight of the evidence, not its admissibility.

Defendant also argues that the prejudicial effect of this evidence substantially outweighed its probative impact and that the trial court should have excluded it under N.C.G.S. § 8C-1, Rule 403. The decision to exclude relevant evidence under Rule 403 lies within the trial court's discretion. *State v. Mason*, 315 N.C. 724, 340 S.E.2d

430 (1986). As noted above, the significant similarities between the bullets found near defendant's house and the bullet that killed Falinda Brooks circumstantially connect defendant to the murders. We cannot conclude that there was unfair prejudice to defendant substantially outweighing the probative value of this evidence, such that the trial court abused its discretion in allowing its admission.

[6] Defendant next contends that the trial court erred in allowing State's witness Connie Jernigan to testify about defendant's statements to her, without sufficient evidence that Jernigan was competent and capable of understanding defendant's communications. Defendant also contends that Jernigan's testimony amounted to inadmissible hearsay because it lacked circumstantial guarantees of trustworthiness equivalent to those implicit in the recognized exceptions to the hearsay rule. Finally, defendant argues that the trial court erred in failing to make findings of fact as required under N.C.G.S. § 15A-977(f). These arguments are without merit.

Before allowing Jernigan to testify regarding defendant's statements, the trial court conducted a voir dire to discover the nature of the statements and Jernigan's ability to understand defendant. Jernigan testified that she had known defendant for eight years prior to the murders and that she had been "going" with him for about a year prior to that time. Jernigan testified that she was able to communicate with defendant, that she would ask him questions and he would give appropriate answers. Though she never had formal training in interpreting sign language, for two or three months prior to the murders defendant had been teaching her that skill. According to Jernigan, defendant could read lips and he would explain things for her in writing when she had trouble understanding sign language or his hand gestures. This was sufficient evidence of Jernigan's ability to communicate with defendant to establish her as a competent witness capable of understanding and recounting his communications to her.

[7] Having established Jernigan as a witness competent to understand and communicate with defendant, there is no hearsay problem with her testimony regarding defendant's incriminating statements to her. Defendant's statements to Jernigan were admissions excluded from the hearsay rule by N.C.G.S. § 8C-1, Rule 801(d). Further, defendant's objection to Jernigan's testimony is not properly characterized as a motion to suppress within the meaning of N.C.G.S. § 15A-977; therefore, the failure of the trial court to make findings

of fact under that statute is of no moment. As stated above, there was abundant evidence of the witness' competency to testify regarding defendant's communications to her. These assignments of error are overruled.

[8] . By his next assignment of error, defendant complains of the admission under Rule 804(b)(5) of hearsay statements attributed to one of the victims, Sarah Jones. The State presented seven witnesses at trial who testified that Jones told them about certain acts and threats towards her by the defendant, including: threats of violence to Jones if she ever ended her relationship with defendant; the fact of their argumentative, troubled relationship and ultimate break-up; a physical threat with a hatchet when defendant drove with Jones down an isolated country road; an incident during an argument between Jones and defendant in which defendant struck Jones on the bare foot with a handgun; defendant's jealousy of Jones' attention and her fear of him; an incident in which defendant tied Jones to a tree and she escaped; and an incident in which defendant pushed Jones down a stairwell at work. Defendant argues that the circumstances surrounding this hearsay evidence do not have sufficient guarantees of trustworthiness to warrant introduction under Rule 804(b)(5), and that its admission at trial violated his state and federal rights to confrontation of witnesses. We disagree.

The residual hearsay exception for instances in which the declarant is unavailable, Rule 804(b)(5), provides:

(b) *Hearsay exceptions.* — The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(5) Other Exceptions. — A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention

to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C.G.S. § 8C-1, Rule 804(b)(5) (1988).

In *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986), this Court articulated the guidelines for admission of hearsay testimony under the provisions of Rule 804(b)(5). Initially, the trial court must determine that the declarant is unavailable; here, the trial court found that Sarah Jones died on 28 August 1988. Following this determination, the trial court must conduct a six-step inquiry to determine:

(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;

(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);

(3) That the statement possesses "equivalent circumstantial guarantees of trustworthiness";

(4) That the proffered statement is offered as evidence of a material fact;

(5) Whether the hearsay is "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means"; and

(6) Whether "the general interests of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence."

*State v. Ali*, 329 N.C. 394, 408, 407 S.E.2d 183, 191-92 (1991) (citing *State v. Triplett*, 316 N.C. at 9, 340 S.E.2d at 741). In conducting this analysis,

[t]he trial court is required to make both findings of fact and conclusions of law on the issues of trustworthiness and probativeness, because they embody the two-prong constitutional test for the admission of hearsay under the confrontation clause, i.e., necessity and trustworthiness. On the other four issues, the trial court must make conclusions of law and give its analysis.

We will find reversible error only if the findings are not supported by competent evidence, or if the law was erroneously applied.

*State v. Deanes*, 323 N.C. 508, 515, 374 S.E.2d 249, 255 (1988), *cert. denied*, 490 U.S. 1101, 104 L. Ed. 2d 1009 (1989) (citations omitted).

Defendant's argument is that the trial court's findings failed to show sufficient guarantees of trustworthiness. In evaluating the trial court's findings and conclusions on this step in the inquiry under Rule 804(b)(5), we have held that:

[I]n weighing the "circumstantial guarantees of trustworthiness" of a hearsay statement . . . the trial judge must consider among other factors (1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination. . . . Also pertinent to this inquiry are factors such as the nature and character of the statement and the relationship of the parties.

*State v. Triplett*, 316 N.C. at 10-11, 340 S.E.2d at 742 (citations omitted). In this case, the trial court considered these factors in making its ruling.

As to each witness, the trial court reviewed the voir dire testimony and made particularized findings, including findings that all the statements were within Jones' personal knowledge and that she never recanted any of the statements. According to the trial court's findings, each of the witnesses was a close friend or relative whom Jones saw almost every day, and in whom she confided regarding the details of her relationship with defendant. The trial court appropriately considered the relationship between the declarant, Sarah Jones, and each of the witnesses. *See State v. Ali*, 329 N.C. at 409, 407 S.E.2d at 192. Further, each of the trial court's findings was supported by competent evidence in the record.

The trial court made substantial efforts to follow the guidelines set forth in *Triplett* for all steps of the inquiry. For each of the seven witnesses the court described the statements at issue and announced on the record its findings and conclusions as to the adequacy of notice, the unavailability of the declarant, the inad-

missibility of the statements under other Rule 804 exceptions, the circumstances guaranteeing the reliability or truthfulness of the declarant's statement, the material issues as to which the statements were especially probative, and the fact that in its opinion the statements' admission was in the interests of justice.[2] As we stated in *Smith*:

> By setting out in the record his analysis of the admissibility of hearsay testimony pursuant to the requirements of Rule 803(24) as set forth above, the trial judge will necessarily undertake the serious consideration and careful determination contemplated by the drafters of the Evidence Code. This thoughtful analysis will greatly aid in assuring that only necessary, probative, material, and trustworthy hearsay evidence will be admitted under this residual exception and will provide a sound framework for meaningful appellate review.

*State v. Smith*, 315 N.C. at 96-97, 337 S.E.2d at 847. The care exercised here by the trial court in evaluating the trustworthiness of this testimony is apparent as much in its decision to exclude other witnesses' hearsay testimony as in its findings and conclusions admitting these witnesses' testimony.

The United States Supreme Court has stated that the residual hearsay exception is not a "firmly rooted" exception for Confrontation Clause purposes. *Idaho v. Wright*, --- U.S. ---, ---, 111 L. Ed. 2d 638, 653 (1991). However, "even if certain hearsay evidence does not fall within 'a firmly rooted hearsay exception' and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by a 'showing of particularized guarantees of trustworthiness.'" *Lee v. Illinois*, 476 U.S. 530, 543-44, 90

---

2. We note, however, that even though the trial court's brief description of the issues as to which the hearsay statements were probative was sufficient on the facts of this case, the better practice is to follow the commands of *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985)—"The [probativeness] requirement imposes the obligation of a dual inquiry: were the proponent's efforts to procure more probative evidence diligent, and is the statement more probative on the point than other evidence that the proponent could reasonably procure?" *Id.* at 95, 337 S.E.2d at 846 (describing the analysis required for admission of hearsay evidence under N.C.G.S. § 8C-1, Rule 803(24), the residual exception where the declarant is present at trial). Under *Smith, Triplett,* and *Deanes,* the need for particular findings on probativeness equals the need for findings on a hearsay statement's trustworthiness.

L. Ed. 2d 514, 527-28 (1986). On the facts of this case we conclude that the trial court's findings supporting the trustworthiness of these statements are sufficient to withstand constitutional challenge as well. Defendant's assignments of error are overruled.

For the foregoing reasons, we conclude that defendant received a fair trial, free from prejudicial error.

No error.