Filed 12/5/25  P. v. Burke CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN FREDERICK BURKE,<br><br>    Defendant and Appellant. | H052332<br>(Santa Cruz County<br>Super. Ct. No. 22CR05087) |

A jury convicted John Frederick Burke of first degree murder, and the trial court sentenced him to a term of 50 years to life plus six years.  On appeal, Burke contends that his conviction must be reversed because the trial court erred in admitting inculpatory statements from his custodial interrogation and prejudicial evidence of his Internet and drug usage.  Burke further contends that the trial prosecutor committed prejudicial misconduct in closing argument by minimizing his burden of proof.  Concluding there is no reversible error, we affirm.

## I.    BACKGROUND

The Santa Cruz County District Attorney charged Burke with murder (Pen. Code, § 187, subd. (a)),[1] and alleged that he personally used a deadly weapon (a knife) to commit the offense (§ 12022, subd. (b)(1)).  The district attorney further alleged a prior

---

[1] Undesignated statutory references are to the Penal Code.

conviction for attempted murder (§§ 664, 187, subd. (a)), which qualified both as a strike offense (§§ 1170.12, 667, subds. (b)–(i)) and a serious felony (§ 667, subd. (a)(1)).

## A.   *Jury Trial*

Neoklis Koumides, an unhoused person, was stabbed to death in a parking garage in Santa Cruz, where he sometimes stayed to keep warm. The sole disputed issue at trial was the identity of his killer.

Video surveillance footage showed that shortly before the stabbing, S.O. was at the garage with Koumides but then biked to Burke's nearby apartment building at 4:46 a.m.[2] Burke's cell phone records indicated that he answered a call from S.O. on his call box at about 4:48 a.m. At 4:54 a.m., video surveillance footage showed Burke leaving his apartment wearing a red hat, khaki pants, gloves, trench coat, and white "Croc" shoes bearing a black skull logo. Burke, on foot, reached the parking garage at about 4:58 a.m. When he returned to his apartment at 5:03 a.m., he was carrying his trench coat and a knife sheath was visible at his waistband. Video footage also showed that Burke had visited the same parking garage the night before.

Three people witnessed Koumides's fatal stabbing but each described the perpetrator differently. C.S. had been sitting with Koumides and others in front of a fire when a "super tall" man in a "black trench coat," "orange beanie," and "tennis shoes" walked up to Koumides and kicked him in the head. Koumides turned around and, while trying to flee, assured his assailant that he will " 'have [his] money.' " When Koumides tripped and fell, the perpetrator jumped on top of him and stabbed him "a few times" before kicking him again and running off. The perpetrator used a "big-assed steak knife" with a brown wooden handle. When C.S. tried to pull the perpetrator off Koumides, the perpetrator warned C.S. to back off and threatened to stab C.S. too.

---

[2] S.O. invoked his Fifth Amendment right against self-incrimination and did not testify at trial.

2

J.T. was sleeping near the garage when he heard someone say, "Where is my fucking money[?]" J.T. saw the perpetrator punch Koumides, knock him to the ground, and then kick him "four or five times" before walking away. J.T. described the perpetrator as approximately 6 feet tall, 185 pounds, wearing a red hat and white hoodie. After the perpetrator fled, J.T. called police at 5:08 a.m.

J.H. saw an "elder gentleman" around six feet six inches and weighing 240 pounds, wearing a red beanie, blue jeans, gray and black tennis shoes: this man was carrying a large kitchen knife—one that "look[ed] exactly like" a knife later found in Burke's apartment—while assaulting Koumides.

The day after Koumides was killed, police arrested Burke at his apartment. Burke was wearing the same shoes he had on during the murder. The right shoe had two drops of blood on it, and DNA testing suggested that the blood belonged to Koumides. The knife seized from Burke's apartment appeared to have been washed and wiped down. Initial testing of the knife indicated the presence of blood, though subsequent DNA testing was unable to conclusively link the blood to Koumides. The pathologist who performed Koumides's autopsy opined that the knife blade's size and shape were consistent with Koumides's fatal injuries.

Two detectives spoke with Burke for about 16 minutes post-arrest before advising him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). During that time, they gathered basic information for a personal history questionnaire, including Burke's age, education and employment history, addresses, drug and alcohol use, current medications, and marital status. The detectives also inquired into Burke's comfort and well-being, including questions about the pain in his shoulder and whether he was in immediate need of an inhaler. The lead detective asked Burke about his interests, hobbies, and engaged in detailed conversation with Burke about his dog.

Burke was not advised of his *Miranda* rights until just before the detectives shifted the discussion to Koumides's murder; post-advisement, Burke said he understood his

3

rights and proceeded to answer the detectives' questions. On Burke's motion to suppress his statements, the trial court suppressed only the pre-advisement portion. After being given his *Miranda* advisement, Burke told detectives that he had been sleeping the morning of Koumides's murder and denied taking S.O.'s call from the call box, going to the parking garage, or stabbing Koumides. But he acknowledged having "a prior knife conviction" and occasionally still carrying a knife in a sheath at his waist. Confronted with surveillance photos from the morning of the murder, Burke identified himself as the man wearing the distinctive beanie and shoes and agreed that he "happened to be wearing" a knife sheath at that time.

After about two and a half hours, Burke told detectives he was "done answering questions," and the interview ended.

## B. *Jury Verdict, Bifurcated Trial, and Sentencing*

The jury found Burke guilty of first degree murder and found true the allegation that he personally used a deadly weapon in committing the offense. Before the jury returned verdicts on the substantive count, Burke waived his jury right on the prior allegations, and the court found them to be true. The court sentenced Burke to a term of 50 years to life plus six years.

Burke timely appealed.

## II.    DISCUSSION

On appeal, Burke argues that the trial court erred in denying his motion to suppress his post-*Miranda* custodial statements, and in admitting evidence of his Internet search history and drug use. Burke also contends that the prosecutor committed prejudicial misconduct in closing argument by minimizing his burden to prove each element of murder.

## A.    *Validity of* Miranda *Waiver*

Before trial, Burke moved to suppress his custodial statements under *Miranda*. After a hearing under Evidence Code section 402, the trial court suppressed only Burke's

4

pre-advisement statements, concluding that the post-advisement statements were not so tainted by the initial *Miranda* violation that they were rendered involuntary. In now urging us to suppress his post-advisement statements, Burke relies on *People v. Honeycutt* (1977) 20 Cal.3d 150 (*Honeycutt*), for the proposition that a *Miranda* waiver is involuntary whenever police "soften[]up" the suspect by "ingratiating conversation" pre-advisement.[3] (*Id.* at p. 160.)

In *Honeycutt*, police responded to an arrestee's refusal to speak with the investigating officer by enlisting a detective who had known the defendant for 10 years. (*Honeycutt*, *supra*, 20 Cal.3d at p. 158.) The detective "engaged defendant in a half-hour unrecorded discussion" on "unrelated past events and former acquaintances and, finally, the victim." (*Ibid.*) The detective also mentioned that the victim had been a suspect in a homicide and "was thought to have homosexual tendencies." (*Ibid.*) At the end of the half-hour conversation, the defendant told the detective that "he would talk about the homicide." (*Ibid.*) Once Mirandized, the defendant confessed to murdering the victim. (*Id.* at p. 159.) The California Supreme Court reversed the conviction, reasoning that when a defendant's *Miranda* waiver "results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary." (*Id.* at p. 160.)

*Honeycutt*, however, was followed by California's adoption in 1982 of a "Right to Truth-in-Evidence." (Prop. 8, as approved by voters, Primary Elec. (June 8, 1982) (Proposition 8); Cal. Const., art. I, § 28, subd. (f)(2) ["relevant evidence shall not be

---

[3] Burke does not dispute that an implicit waiver of his *Miranda* rights can be inferred from his decision to begin speaking with detectives about Koumides's murder upon confirming that he understood the advisement. (See *People v. Cunningham* (2015) 61 Cal.4th 609, 642 [inferring waiver "if a custodial suspect, having heard and understood a full explanation of . . . *Miranda* rights, then makes an uncompelled and uncoerced decision to talk"].)

excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial"].) Proposition 8 "was intended to permit [the] exclusion of relevant, but unlawfully obtained evidence, only if exclusion is required by the United States Constitution." (*In* re *Lance W.* (1985) 37 Cal.3d 873, 890; see also *People v. May* (1988) 44 Cal.3d 309, 316–317 [holding that judicially created exclusionary rule designed to remedy *Miranda* violations did not survive Prop. 8].) Proposition 8 requires us to apply federal law to determine "whether a statement obtained in violation of *Miranda* compels exclusion of subsequent statements made by the defendant." (*People v. Torres* (1989) 213 Cal.App.3d 1248, 1254 (*Torres*); see also *People v. Gastile* (1988) 205 Cal.App.3d 1376, 1386 [holding that "California courts may not extend the *Miranda* exclusionary rule beyond that stated by the United States Supreme Court"], disapproved on other grounds in *People v. Wrest* (1992) 3 Cal.4th 1088, 1104–1105.)

Oregon v. Elstad* (1985) 470 U.S. 298 (*Elstad*) and *Missouri v. Seibert* (2004) 542 U.S. 600 (plur. opn.) (*Seibert*) represent the controlling federal authority on this issue. In *Elstad*, the United States Supreme Court held that the failure to administer *Miranda* warnings during a custodial interrogation—"unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise . . . free will"— does not invalidate the suspect's later waiver of *Miranda* rights. (*Elstad*, at p. 309.) In *Seibert*, the Court clarified the outer bounds of *Elstad*, holding that exclusion was warranted when an investigating officer deliberately elicited incriminating information from an unwarned suspect in custody, leaving "little, if anything, of incriminating potential . . . unsaid" when warnings were finally given and predictably waived. (*Seibert*, at p. 616; see *id.* at pp. 604–606, 611; *People v. Sumagang* (2021) 69 Cal.App.5th 712, 725 (*Sumagang*).)

Burke here does not contend that his *Miranda* waiver or ensuing statements were the product of police inducement designed to undermine his free will. (Cf. *Elstad*, *supra*, 470 U.S. at p. 309; see also *Torres, supra*, 213 Cal.App.3d at pp. 1254–1255.) He asserts

only that, having "engage[d him] in conversation softening him up," the detectives "ma[de] him more likely to waive his rights." But persuasion is not the same as coercion, and nothing about the pre-*Miranda* "ingratiati[on]" can reasonably be likened to being "threatened, tricked, or cajoled into a waiver." (*Honeycutt*, *supra*, 20 Cal.3d at p. 160.) Nor does Burke contend that the two detectives interviewing him engaged in a deliberate attempt to elicit incriminating information from him before the *Miranda* warning. (Compare *Sumagang*, *supra*, 69 Cal.App.5th at p. 726.) Indeed, the transcript of Burke's custodial interview makes clear that neither detective attempted to speak with Burke about the circumstances of Koumides's murder prior to advising him of his rights, but only engaged Burke in unrelated, "ingratiating conversation" until after *Miranda* warnings had been given. Such ingratiating conversation, without more, does not warrant suppression of Burke's post-advisement custodial statements under *Seibert.*

Consistent with these federal authorities, the California Supreme Court has limited *Honeycutt* to what it has since described as *Honeycutt*'s " 'two salient features,' " without which any reliance would be " 'misplaced.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 306.) The first feature is the involvement of an "interrogating officer who had a prior relationship with the defendant" and whose ingratiation entails discussion of " ' "unrelated past events and former acquaintances." ' " (*Id.* at p. 306.) The second salient feature of *Honeycutt* is the interrogating officer's "disparagement of the victim." (*Ibid.*; see also *People v. Scott* (2011) 52 Cal.4th 452, 477–478.) Neither "salient feature" is present here: In the interview, both detectives disclaimed any prior relationship with Burke, and Burke did not claim otherwise. They did not attempt to reminisce with Burke about "unrelated past events" or "former acquaintances" during the interview. And neither detective disparaged Koumides to attempt to minimize his killing. (*Krebs*, at p. 306.)

We therefore reject Burke's argument that the trial court erred in failing to suppress his post-advisement statements.

7

**B.**    *Evidence of Internet and Drug Usage*

The trial court also overruled Burke's relevance and Evidence Code section 352 objections to (1) his post-advisement admission that he used speed "a couple [of] times a day," most recently the afternoon of his arrest, and (2) the lead detective's testimony that on the morning of Koumides's murder, Burke had visited a website featuring "taboo sex stories" shortly before the call from S.O. and returned to the same website later that day.[4]

Burke argues that neither category of evidence was relevant to the charge, and even if marginally relevant, should have been excluded under Evidence Code section 352. Assuming the trial court abused its discretion in admitting the evidence, however, we review the erroneous admission of evidence under the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). And Burke has not shown that it is " 'reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the [alleged] error.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1308.)

Despite the risk of unfair prejudice from the limited testimony about Burke's drug use and Internet browsing near the time of the fatal stabbing, we detect no reasonable probability of a result more favorable to Burke absent this evidence. When applying *Watson*, we may consider, "among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 255.)

---

[4] The court accepted the prosecution's theory that the evidence was relevant to show both that Burke had lied to police when he told them that he had been asleep at the time of S.O.'s call and that Burke interrupted a "goal-oriented" activity in favor of a willful, deliberate, and premeditated plan to commit murder. Neither the trial court nor the prosecutor offered any justification for admitting the characterization of the "sex stories" as "taboo."

Evidence of Burke's guilt was strong, and evidence supporting a different outcome was negligible. Burke was captured on video first leaving his apartment for the garage, immediately after a call from someone who had just left Koumides there, then returning—with a knife sheath no longer obscured by his trench coat—minutes before the 9-1-1 call reporting Koumides's murder. Three eyewitnesses to the stabbing each reported seeing a man in a red or orange beanie, consistent with Burke's appearance in surveillance footage capturing his departure from his apartment. During his interview with police, Burke admitted he "occasionally" carried a knife, that he carried it in a sheath at his waist, and that he "happened to be wearing" a knife sheath the morning Koumides was murdered. The knife seized from Burke's assigned drawer in the apartment kitchen tested presumptive positive for blood, was recognized by one of the witnesses as "look[ing] exactly like" the one the perpetrator carried, and was consistent in both size and shape to the stabbing instrument used to kill Koumides. On his arrest, Burke was wearing the same skull Crocs he had on the day before, on which DNA testing detected drops of blood matching Koumides's.

Because any error the trial court made in admitting evidence relating to Burke's Internet and drug usage was harmless, reversal based on these alleged errors is unwarranted.

## C.     *Prosecutorial Misconduct/Ineffective Assistance*

Finally, Burke takes issue with the prosecutor's statement in closing argument that the jurors could "start off at second degree [murder] and . . . look to see if there is express or implied malice" and then "[i]f there is express[] malice you . . . consider" first degree. Burke contends the prosecutor by this argument improperly suggested that it was "not required to first prove the killing was unlawful and with malice, sidestepping the constitutional requirement to prove every element of the charged crime beyond a

9

reasonable doubt."[5]  Construing in context the prosecutor's invitation to "start off at second degree murder," we discern no misconduct.

To be sure, " 'it is improper for the prosecutor to misstate the law generally,' " and " 'particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) But " 'the arguments of counsel . . . must be judged in the context in which they are made.' " (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1151 [same].)  Here, the disputed snippet of the prosecutor's argument followed his lengthy recitation of the evidence presented at trial, from which the jury could reasonably infer both that Burke had committed an unlawful killing, and that he had acted with malice.  Moreover, Burke at trial neither claimed that the killing of Koumides was justified or excused, nor disputed any element of the charged offense.  Instead, his sole defense was mistaken identity.  Because Burke never disputed the unlawfulness of the killing (only his role in it), the prosecutor's omission of the unlawfulness element from his argument was not misconduct.

Relatedly, the prosecutor never suggested to the jury that he did not have to prove malice.  Indeed, immediately after inviting the jury to start their analysis at second degree murder, the prosecutor went on to correctly define malice as "two different kinds, it can be express[], it can be implied, and either one of those is sufficient for murder."  The prosecutor then spent some time explaining to the jury the distinction between first and second degree murder.  When viewed in the proper context and in totality, the prosecutor's summary of the law was accurate, in line with the jury instruction given by

_____

[5] Although Burke's trial counsel failed to preserve this claim, we address the merits, given Burke's alternative argument that counsel was constitutionally ineffective for failing to object.  (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125–1126.)

10

the trial court,[6] and in our view did nothing to diminish the prosecution's burden of proof on malice or unlawfulness.

There was no misconduct. So Burke's counsel cannot be said to have rendered deficient performance by failing to object to it.

## III. DISPOSITION

The judgment is affirmed.

---

[6] The trial court's jury instruction on murder stated that the prosecution must prove the following elements beyond a reasonable doubt: "1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought," which in turn can be express or implied. (CALCRIM No. 520.)

_____
LIE, J.

WE CONCUR:

_____
GROVER, Acting P. J.

_____
WILSON, J.

*People v. Burke*
H052332